**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| **PSLC LLC,** | |
| **Plaintiff,** | C.A. No. 2:24-cv-1270-PP |
| **v.** | **JURY TRIAL DEMANDED** |
| **GENERAC POWER SYSTEMS, INC.,** | |
| **Defendant.** | |

**DEFENDANT GENERAC POWER SYSTEMS, INC.'S**
**RULE 12(b)(6) MOTION TO DISMISS**

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

II.     FACTUAL BACKGROUND................................................................................2

III.    LEGAL STANDARDS ........................................................................................4

IV.     ARGUMENT........................................................................................................5

      A.    Claim 37 of the '727 Patent is Ineligible ...................................................5

            1.    Alice Step One: given that Claim 37 focuses on a
                    computer that prevents overloads, it is directed to
                    automated load management, an abstract idea.................................6

            2.    Alice Step Two: given that only conventional power
                    management components that perform their normal
                    functions are claimed, there is no inventive concept. ..................11

            3.    The Court can analyze just the '727 Patent's Claim 37 as
                    a representative claim. ..................................................................14

      B.    Claim 17 of the'618 Patent is Ineligible ...................................................16

            1.    Asserted Claim 17 of the '618 Patent ...........................................17

            2.    The same reasoning for Alice steps 1 and 2 applies to
                    the '618 Patent's Claim 17............................................................18

            3.    The Court can analyze just the '618 Patent's Claim 17 as
                    a representative claim. ..................................................................20

      C.    Claim 1 the '857 Patent is Ineligible.........................................................23

            1.    Asserted Claim 1 of the '857 Patent .............................................23

            2.    The same reasoning for Alice steps 1 and 2 apply to the
                    '857 Patent's Claims.....................................................................24

            3.    The Court can analyze just the '857 Patent's Claim 1 as
                    a representative claim. ..................................................................26

      D.    The § 101 Inquiry is Ripe ..........................................................................29

V.      CONCLUSION...................................................................................................30

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)....................................................................13, 20

*Alice Corp. Pty. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ...................................................................................... *passim*

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ...........................................................................................4, 13, 26

*BoardActive Corp. v. Foursquare Labs, Inc.*,
    No. 1:22-CV-00597-JDW, 2023 WL 2587688 (D. Del. Mar. 21, 2023)...............................27

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
    113 F.4th 1359 (Fed. Cir. 2024) .................................................................. *passim*

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018).........................................................................11, 30

*Cambridge Mobile Telematics, Inc. v. Zendrive, Inc.*,
    No. CV 22-1260-RGA, 2023 WL 4850567 (D. Del. July 28, 2023).....................................29

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)...............................................................................14

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
    859 F.3d 1352 (Fed. Cir. 2017)...............................................................4, 16, 28

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014)................................................................... *passim*

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018)................................................................................4

*Diamond v. Diehr*,
    450 U.S. 175 (1981)..............................................................................12, 16, 20, 22

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. App'x 529 (Fed. Cir. 2020) ....................................................................30

*Ficep Corp. v. Peddinghaus Corp.*,
    No. 2022-1590, 2023 WL 5346043 (Fed. Cir. 2023) ...........................10, 11, 12, 13

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)...............................................................................6

ii

*Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*,
    72 F. Supp. 3d 521 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*,
    818 F.3d 1369 (Fed. Cir. 2016) ................................................................................8

*Gottschalk v. Benson*,
    409 U.S. 63 (1972) ..........................................................................................13

*Intell. Ventures I LLC v. Cap. One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015) ...........................................................9, 19, 25

*Intell. Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ..........................................................13, 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ..........................................................................................11

*Mobile Acuity Ltd. v. Blippar Ltd.*,
    110 F.4th 1280 (Fed. Cir. 2024) .......................................................................5

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) ..........................................................18, 24, 29

*P & RO Sols. Grp., Inc. v. CiM Maint*,
    273 F. Supp. 3d 699 (E.D. Tex. 2017) .............................................................13, 20

*Parker v. Flook*,
    437 U.S. 584 (1978) .................................................................................. *passim*

*Prestige Pet Prod., Inc. v. Pingyang Huaxing Leather & Plastic Co.*,
    767 F. Supp. 2d 806 (E.D. Mich. 2011) ...........................................................8

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ........................................................................6

*Ultramerical, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ..........................................................................4

*Yu v. Apple Inc.*,
    1 F.4th at 1045 .................................................................................................14

**Statutes**

35 U.S.C. § 101 ........................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ...........................................................................1, 8, 30

iii

## I. INTRODUCTION

Under Federal Rule of Civil Procedure 12(b)(6), a Plaintiff fails to state a claim when they assert patent infringement of invalid claims. And under *Alice Corp. v. CLS Bank Int'l*, claims are invalid when directed to an abstract idea and lacking an inventive concept. Here, PSLC accuses Generac of infringing three related patents, but every claim recites little more than conventional components with a computer programmed to automate manual processes—preventing power systems from exceeding their maximum output (i.e., an "overload"). This is invalid under *Alice*.

Under *Alice*'s first step, all three patents' claims are directed to the abstract idea of automated load management. They recite conventional components used for their conventional purpose that the patents admit are present in the prior art; once those are removed, all that remains is a computer programmed to prevent overloads. Any additional recited considerations, parameters, or user inputs are little more than conventional variables in the algorithm the computer uses to reach this result. In effect, the claims seek to automate what is otherwise a manual, pen-and-paper process for preventing overloads, only adding the instruction "do it on a computer."

Moreover, all three patents lack any inventive concepts of the kind that would save them under *Alice*'s second step. The patentee's goal was to monopolize this concept of automation in any kind of power system—regardless of the power generation technology involved. Thus, the selection of conventional components specific to an electrical power system only limits the application of automatic load management to a particular technological environment but does not change focus from the abstract concept. Many components amount to little more than adding token, post-solution steps or functionality that do not sway the claims' focus on automatically managing loads. In effect, the patents' only purported invention is automating a known manual process using known parameters—this is not inventive under *Alice*.

1

Because all the patents are directed to abstract ideas and lack inventive concepts, this Court should invalidate PSLC's patents and dismiss PSLC's claims.

## II.  FACTUAL BACKGROUND

PSLC asserts related U.S. Patent Nos. 10,879,727 (the "'727 Patent"), 10,892,618 (the "'618 Patent"), and 11,967,857 (the "'857 Patent") (collectively, the "Asserted Patents"). The '727 Patent is a direct parent of the '618 and '857 Patents. All three patents share the same specification.

These patents are in the field of managing power sources, such as a municipal power grid, backup power generator or solar panel, '727 Patent at Abstract, or focusing on the loads (i.e., devices) being powered, *id.* at 2:28–30. A power source can only supply power for so many loads because it "has a maximum load handling capability dictated by the power generation and delivery path . . . or a maximum output." *Id.* at 2:4–27. In an electrical power system, power is related to the electrical voltage provided and the current drawn. To calculate the individual loads on a power source, it is "understood that for most devices the voltage applied from the [power source] is substantially constant." *Id.* at 4:55–58. Consequently, the current drawn by the device is directly correlated to the load on the power source. *Id.*

The patents explain the inventor's goal: that "there is a need to determine and control which and how many loads are connected in order that the total of the loads does not create an overload." '727 Patent at 2:13–15. "Overloads are generally undesirable in that they may cause deviation from power output specifications, loss of power, damage or combinations thereof." *Id.* at 2:15–19. Previously, people solved this overloading problem by employing a "well known" method called "load shedding," *id.* at 6:1–2, which refers to "prior art systems which detect when a generator is in an overload condition and switch off [i.e., 'shed'] loads," *id.* at 5:66–67. For example, some automated load manager systems for electrical power sensed a condition where the power frequency drops from the standard 60 Hz, indicating an overload. *Id.* at 6:9–25, 6:38–50. But,

2

"[i]mportantly[,] load shedding takes place when the load is connected and overload detected." *Id.* at 6:6–7. That is, load shedding in this system "takes place *after* the overload happens." *Id.* at 6:49–50 (emphasis added).

The patentee desired to shed loads *before* overloading. *Id.* at 8:57–59. He aimed to "prevent overloading of the power source by preventing a load which would otherwise immediately cause or which could lead to a future overload from being connected or alternatively by restricting the power supplied." *Id.* at 8:61–65. This approach to proactive load shedding was admittedly not new, however. It was previously manually done:

> Often generators are intentionally designed to only provide power to handle a part of the total load, and the occupants of the house must remember not to turn on certain large loads, for example the air conditioner and oven, which would cause an overload. In addition, if those large loads are on at the time when power is lost, the occupants must quickly turn them off before the generator is started and transfer switch moved to prevent an overload. This all presents a substantial possibility of generator damage resulting from human error.

*Id.* at 17:34–43.

The patentee chose to accomplish this instead through *automated* "connection and disconnection of individual loads," *id.* at 8:66–9:1, so "that the total load on any one power source is kept at or below the maximum output capability of that power source," *id.* at 9:62–64. The solution would "sense" and use the "conditions which affect that maximum available output power" with information about the power source "to determine precisely what that maximum available output power is at a given time, what the expected available power will be at one or more times in the future as well as the present and future effect the connection of a particular load may have on available power." *Id.* at 9:9–17.

Although the patentee described primarily embodiments for electrical generator systems, his idea of automated load management was not limited to any particular technological environment. *Id.* at 2:44–59. He explained that his "inventive concepts" could be "utilized for

3

many types of power systems, including but not limited to hydraulic, fluid or gaseous heating, mechanical, thermal, solar, wind, liquid fuel, gas fuel, solid fuel and combinations thereof." *Id*. One of ordinary skill would recognize that "well known correlations" between various systems could be used to apply the invention to many forms of power sources. *Id*.

III.    **LEGAL STANDARDS**

Patent eligibility under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). It is properly determined on the pleadings "when there are no factual allegations that, when taken as true, prevent resolving the eligibility question as a matter of law." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018); *Ultramerical, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) ("[T]he district court properly invoked section 101 to dismiss" the plaintiff's "infringement suit on the pleadings.").

Under *Alice*'s two-step test for identifying patents that claim ineligible subject matter, courts first analyze whether "the claims at issue are directed to one of [the] patent-ineligible concepts," like an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). If so, courts then determine whether the claim recites other elements that transform the claim into a patent-eligible application, examining whether there is an inventive concept that amounts to more than merely applying the abstract idea to a particular technological environment. *Id.*

After performing this analysis for one representative claim, courts can often extrapolate that conclusion to the remaining claims—limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are "substantially similar and linked to the same" ineligible concept. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (internal quotation marks omitted). The challenger who identifies a claim as representative of a group of claims must initially show that the claims are "substantially similar and linked to the same" ineligible concept. *Id.* at 1360. "Once this occurs, the burden shifts

4

to the patent owner to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024).

## IV. ARGUMENT

All the Asserted Patents' claims are invalid under § 101. Because the patents are all related, share nearly identical specifications, and have insubstantial claim differences that do not alter their focus or claimed advance, this analysis can be performed with three representative claims. Given the Asserted Patents' similarities, *Alice*'s two-step test will be applied to Claim 37 of the '727 Patent in full. Then, the analysis will be applied to the other representative claims, identifying how they differ from Claim 37 and explaining why these differences do not change the outcome of the *Alice* test. Here, these representative claims, like all the claims, are directed to the abstract idea of automated load management because their focus is only on, at their core, a computer programmed to achieve this result. Their use of conventional components and token, post-solution steps or functionality do not make the application of the abstract idea inventive. Thus, all claims are invalid.

### A. Claim 37 of the '727 Patent is Ineligible

Asserted Claim 37 of the '727 Patent is directed to the ineligible abstract idea of automating load management. It claims using a generic computer programmed to automate the well-known process with conventional components. As detailed in the table below, Claim 37 recites (1) a switch for disconnecting a load, (2) a computer to control the power delivered to various loads, and (3) software capable of the desired result—monitoring for and preventing an overload.

| Component and Function | Claim |
|---|---|
| Preamble: Automated load manager | 37. An apparatus for controlling power provided from a plurality of power sources to a group of loads, the apparatus including: |
| A switch that selects the power grid or battery backup as the power source | a) a small backup power system transfer switch which is controllable to select a power grid service circuit or a DC to AC inverter to power a group of loads, the DC to AC |

5

| Component and Function | Claim |
|---|---|
| | inverter being powered by a battery with the battery being charged by a battery charger, the power grid service circuit and the DC to AC inverter each having a maximum output current capability; |
| A computer that switches to the battery backup when the power grid fails | b) a processor circuit being programmed to control the transfer switch and the DC to AC inverter to power one or more loads of the group of loads including the battery charger from the power grid when the power grid operates at an acceptable voltage and to cause the one or more loads of the group of loads but not the battery charger to be powered by the DC to AC inverter when the power grid does not operate at the acceptable voltage; |
| The computer also prevents the battery backup from overloading | c) the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter. |

1. ***Alice* Step One: given that Claim 37 focuses on a computer that prevents overloads, it is directed to automated load management, an abstract idea.**

Claim 37 is directed to the abstract idea of automated load management. When determining whether a claim is directed to an abstract idea, courts consider the "focus" or "claimed advance" of the claim. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018). Here, Claim 37's advance focuses on the *result*—a machine capable of automated load management. Because the conventional components recited by the claim do not sway its focus from a machine that prevents the maximum power from being exceeded, Claim 37 (and all the claims it represents) is directed to the abstract idea of automated load management.

To aid in determining Claim 37's "claimed advance," the Court can look past the conventional components that it employs. The Federal Circuit has "recognized that it may be necessary to analyze conventionality at step one . . . to determine what the patent asserts is the claimed advance over the prior art." *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1369 (Fed. Cir. 2024). Here, the claim recites conventional and generic components without any

attendant improvement in these components, including a "power grid service circuit," "transfer switch," "battery," "DC to AC inverter," "battery charger," and "processor circuit." '727 Patent at Cl. 37. The specification explicitly states that these things are interchangeable components or are well-known in the prior art. *Id.* at Figs. 2–4, element 12 (power grid); 3:5–8 (transfer switch); 43:59–64 (explaining use of a battery and DC to AC inverter from an earlier patent); 5:28–41 (battery charger); 9:46–57, 27:61–28:14 (processor or processor circuit). Indeed, the patent plainly presents a laundry list of components and functions that one of ordinary skill in the art would be well acquainted with, specifically stating that

> [d]escriptions of, and nomenclature pertaining to, elements of the invention are given in respect to names of electrical and electronic devices or operations (e.g. **switch**, **generator**, **processor** or **processor circuit**, **power grid**, solar panel, wind turbine, fuel cell, communications, communications channel, interface or interface circuit) or a descriptive name of a function performed with respect to some device or condition (e.g. load monitor, generator monitor, load control, **load switch**, communications link) all ***are well known to one of ordinary skill*** from the teachings of the preferred embodiment of the invention and context of usage.

*Id.* at 9:48–57 (emphasis added); *see also* Compl. ¶ 27, ECF No. 1 (alleging same).

Their arrangement is also conventional. Load managers for load shedding were commercially available. *Id.* at 6:9–25. The patentee described prior art systems that sensed grid power and moved a transfer switch to backup power if the grid power fails. *Id.*; *see also id.* at Figs. 1 and 2, 16:39–17:35. Individuals might choose to manually disconnect large loads to prevent overloading of the backup power source. *Id.* at 17:35–44. Or the prior art system might have a load manager that automatically disconnected loads to address an overload scenario. *Id.* at 17:44–18:12. The maximum capacity of a power source to define an overload was also a familiar metric. The patentee explained during prosecution that "a generator manufacturer might provide maximum specifications and conditions under which they are guaranteed." Ex. A, U.S. Appl. No. 13/481,804,

Appeal Br. at 7 (April 10, 2020).[1] The specification notes that one form of a guarantee—a "maximum current capacity"—may be "manufacturer specified." *See, e.g.*, '727 Patent at Cl. 12.

When these conventional features are removed, only one thing remains as the alleged "advance over the prior art," *Broadband iTV*, 113 F.4th at 1369. Here, that alleged advance is "program[ing] to timely monitor the current provided to the loads . . . and to prevent exceeding the maximum current capacity." *Id.* at Cl. 37. That is, automating the system to perform a well-known process to achieve a desired result using well-known parameters. This "program" is just an unexplained algorithm that is claimed as the desired result: a machine capable of automatic load management to prevent overloads.

Because all that remains is the program's algorithmic result—the particular algorithm being unspecified and abstract enough to encompass really any "other decision making criteria which is provided to the load control," *id.* at 40:16–17[2]—the claims are directed to an abstract idea. The Supreme Court considered analogous circumstances in *Parker v. Flook*, 437 U.S. 584, 594 (1978). There, the Court held that claims drawn to a method of computing an updated alarm limit were just an attempt to patent a mathematical abstraction, and therefore not patentable subject

---

[1] Courts take judicial notice of prosecution histories for purposes of a Rule 12 motion to dismiss because such documents are public records. *Prestige Pet Prod., Inc. v. Pingyang Huaxing Leather & Plastic Co.*, 767 F. Supp. 2d 806, 813 (E.D. Mich. 2011) ("The court considers the Office Action as a 'letter decision of [a] governmental agenc[y],' which may be considered in a motion to dismiss brought under Rule 12(b)(6)."); *Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 526 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016) ("A court may also take judicial notice of the prosecution histories, which are 'public records.'").

[2] *See also id.* at 9:66–10:9 ("The decision making used by the preferred embodiment of the invention for connecting, supplying and/or controlling a particular load to the power source is preferred to be responsive to the capabilities of the power source and the type of load to be connected (including one or more parameter of each), the priority or importance of the load to be connected, the timeliness of the load connection, environmental parameters which affect the power source and loads and the input of one or more persons desiring to use a device presenting a particular load.").

matter. *Id.* The Court held that "if a claim is directed essentially to a method of calculating, using a mathematical formula, ***even if the solution is for a specific purpose***, the claimed method is nonstatutory." *Id.* (emphasis added). Under *Flook*, "even when tied to a specific end use," a "claim for an improved method of calculation . . . is unpatentable subject matter under § 101." *Id.* Here, the claims recite a computer programmed to "monitor the current provided to the loads" and then performing some unspecified series calculations and logic "to prevent exceeding the maximum current capacity." *Id.* at Cl. 37. The specification hints at the basic steps of this algorithm in a situation where the power "demand increased beyond what a power source . . . is capable of providing." *Id.* at 39:66–67. In that situation, the system will prevent an overload in any number of ways, including deciding to "not connect the additional load(s)," by "control[ing] power supplied to the additional load(s)," or by "connect[ing] additional power source(s) . . . thus providing additional power for the additional loads." *Id.* at 40:1–6. Similar to how *Flook*'s "formula itself was an abstract idea," *Alice*, 573 U.S. at 222, the claimed algorithmic programming employing such basic math and "if-then" logic is too. Certainly, if the claims in *Flook* were abstract because they were directed to a *specific* formula, then Claim 37 is abstract because it is directed to *any* formula for achieving the desired result.

"Indeed, the . . . calculations at issue here are unpatentable because they 'could still be made using a pencil and paper.'" *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1368–69 (Fed. Cir. 2015). Much like the claims in *Intellectual Ventures* were "directed to an abstract idea" of "tracking financial transactions to determine whether they exceed a pre-set spending limit," *id.* at 1318, here, the claim is directed an automatic load management system that prevents the required power from exceeding the maximum "budgeted" power limits of the system. Claim 37 monitors data (power conditions), analyzes it (calculates whether the load is below the

9

maximum), and performs an action (switching power sources and/or prioritizing loads). The specification explains that this pencil-and-paper exercise is what people used to do for backup generators. They "must be designed so that it is capable of powering all of those loads when they are simultaneously turned on," *id.* at 17:29–31, or else "the occupants of the house must remember not to turn on certain large loads, for example the air conditioner and oven, which would cause an overload," *id.* at 17:36–38. Claim 37 merely automates this manual process of looking at the devices connected, summing up their combined load, and determining whether the devices draw too much power. But "[a]utomating a previously manual process is not sufficient for patent eligibility." *Ficep Corp. v. Peddinghaus Corp.*, No. 2022-1590, 2023 WL 5346043, at *4 (Fed. Cir. 2023).

Similar claims in other cases were directed to abstract ideas. For example, the court in *Michigan Motor Techs., LLC v. Bayerische Motoren Werke AG* applied § 101 to a "'method for testing the integrity of an electronic throttle disable function' for internal combustion engines." 683 F. Supp. 3d 811, 828 (N.D. Ill. 2023). The court found a claim abstract because it was "directed to determining values (i.e., determining a first and second throttle position in different states), calculating the differences between those values, and directing a result (i.e., engaging failure mode or not) based on that calculation." *Id.* at 829. The claims were little more than "an improvement to 'the selectional and mathematical analysis of information,' which is a wholly abstract idea not protected under Alice Step 1." *Id.* at 829. Here, analogously, Claim 37 determines the load being connected to the power source, compares it to the maximum load, and (based on that comparison) determines whether an overload will result. If so, it "direct[s] a result," *id.* at 829, by deciding "not connect the additional load(s)," by "control[ing] power supplied to the additional load(s)," or by "connect[ing] additional power source(s)," preventing the overload, *id.* at 40:1–6.

10

### 2. *Alice Step Two: given that only conventional power management components that perform their normal functions are claimed, there is no inventive concept.*

A claim fails *Alice* step two if its "only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73 (2012) (explaining the inventive concept must be "significantly more" than the abstract idea itself). In other words, an abstract idea "cannot supply the inventive concept." *BSG Tech*, 899 F.3d at 1290. Because the representative claim merely applies the abstract idea, there is no inventive concept.

That Claim 37 is merely applying the abstract idea is clear from its use of standard components found in the prior art for their normal tasks. Indeed, as analyzed for *Alice*'s first step, the "transfer switch," "power grid service circuit," "DC to AC inverter" "battery," "battery charger," and "processor circuit" are interchangeable or known in the prior art. '727 Patent at Cl. 37; *id.* at Figs. 2–4, element 12 (power grid), 3:5–8 (transfer switch), 43:59–64 (explaining use of a battery and DC to AC inverter from an earlier patent), 5:28–41 (battery charger), 9:46–57, 27:61–28:14 (processor or processor circuit). Once all of that is stripped away, the claimed "program[ing] to timely monitor the current provided to the loads . . . and to prevent exceeding the maximum current capacity" does little more than claim a generic processor to perform automated load management. *Id.* Cl. 37. Because this "amount[s] to 'nothing significantly more' than an instruction to apply [the] abstract idea . . . using some unspecified, generic computer," it cannot make the abstract idea patent eligible. *Alice*, 573 U.S. at 225–26.

This is the same problem that brought the court in *Michigan Motor Technologies* to invalidate the claims at issue. 683 F. Supp. 3d at 831–32. There, the court invalidated a patent whose "only inventive concept" was "using conventional and known 'drive electronics and

11

position voltage sensors' to gather the data inputs for an abstract calculation—the comparison [sic] the throttle position voltage to a predetermined default position voltage to determine if there is a significant difference." *Id.* at 832. Here, Claim 37 is analogously "programmed to timely monitor the current provided to the loads by said DC to AC inverter." '727 Patent at Cl. 37. The specification elaborates that the invention "is preferred to sense one or more of the various conditions which affect that maximum available output power." *Id.* at 9:9–11. Once it has those, it "use[s] those conditions along with the characterization of the generator to determine precisely what that maximum available output power is at a given time." *Id.* at 9:11–14. Claim 37 uses "conventional and known" components (like "DC to AC inverter," "transfer switch," "processor circuit," and unclaimed sensors) "to gather the data inputs for an abstract calculation." *Id.* That calculation is determining whether an overload will occur. "This is insufficient" under *Alice*. *Michigan Motor Techs.*, 683 F. Supp. 3d at 832.

Even looking at all these conventional components' extraneous features and functions as a whole, they are mere "token post-solution activity" that do not make the application of this abstract idea inventive. "[I]nsignificant post-solution activity will not transform an unpatentable principle into a patentable process." *Diamond v. Diehr*, 450 U.S. 175, 191–92 (1981). Basic acts like switching a load to a different power source based on an instruction from the processor "is no different than the conventional" functions of a such a switch "and, in the context of this claim, is merely post-solution activity." *Ficep*, No. 2022-1590, 2023 WL 5346043, at *6 (citing *Diehr*, 450 U.S. at 191–92). Further, specifying the system is a "small backup power system" does not make it inventive—the Supreme Court "established that limiting an abstract idea to one field of use" does "not make the concept patentable." *Bilski v. Kappos*, 561 U.S. 593, 612 (2010).

And importantly, the patentee conceded that his idea was so broad that it could preempt avoiding an overload beyond "backup power systems." *Gottschalk v. Benson*, 409 U.S. 63, 71–72 (1972) (finding claims patent ineligible because they "would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself"); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1320–21 (Fed. Cir. 2016) (complete preemption of all fields not necessary). Here, the application of the abstract idea to improve electrical power sources is not the focus, but just an exemplary technological environment in which to apply it. The specification explains that invention "may be practiced in a manner to be utilized with other types and combinations of power sources and loads to achieve a desired level of performance for a particular system." '727 Patent at 9:36–39. The patentee argued the concept applies to ***any*** power system:

> In that ***the invention finds applicability for preventing overloads*** it will be understood that it may be utilized ***for any power source or combination of sources***, including off grid systems such as remote terrestrial, aircraft, on and off road vehicles and marine applications with or without connection to the power grid.

*Id.* at 21:35–41 (emphasis added).

That the "acceptable voltage" and "maximum current capacity" are left open-ended or configurable does not cause these claims to be inventive. Added "configurability" is not an inventive concept. *See, e.g.*, *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1272 (Fed. Cir. 2016) ("The addition of basic user customization features to the . . . does not add an inventive component that renders the claims patentable."); *P & RO Sols. Grp., Inc. v. CiM Maint.*, Inc., 273 F. Supp. 3d 699, 710 (E.D. Tex. 2017) ("Claims 12–13 add limitations relating to configurability, which is not an inventive concept.").

Claim 37 is "simply an abstract-idea-based solution implemented with generic technical components in a conventional way." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 775 (Fed. Cir. 2019). "Nothing in the claims, understood in light of the specification, requires anything

13

other than off-the-shelf conventional computer technology." *Elec. Power Grp., LLC,* 830 F.3d at 1355; *Yu v. Apple Inc.*, 1 F.4th at 1045. Nor does the arrangement of these conventional components amount to "significantly more" than the abstract idea itself. *Intellectual Ventures I*, 838 F.3d at 1320.

### 3. The Court can analyze just the '727 Patent's Claim 37 as a representative claim.

When claims are "substantially similar and linked to the same abstract idea," courts look to representative claims to perform the § 101 analysis. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Alice*, 573 U.S. at 224–26 (invalidating over two-hundred claims across four patents based on two representative claims). Because the remaining claims are directed to the same features in some narrowed way or add features that do not alter claim's focus on preventing overloads through automating load management, Claim 37 is representative of all the '727 Patents' claims.

The '727 Patent contains sixty-two claims, ten of which are independent claims. The ten independent claims recite the same basic components as Claim 37 with the additions that do not change their focus from automatic load management to prevent overloads. For example:

- Claims 1–4 specify how the overload is avoided—Claims 1–2 prevent the load from being hooked up at all, and Claims 3–4 adjust the current or power being consumed.

- Claims 12 and 13 replace or add the switching function of Claim 37 with current limiting functionality. Claim 12 specifies how the load is limited (limiting the current consumed), and Claim 13 is the same but limits the current from both the power grid and generator.

- Claims 14 and 15 (in addition to current limiting capability) add a third power source and different configurations for when the different sources should be connected to the loads. Claim 14 limits the current and can control switching to avoid overloading a third power source and a generator. And Claim 15 is similar to Claim 14, but it focuses on preventing exceeding the maximum capacity of only the third power source.

- Claim 44 adds only token details, like the number of inputs and outputs, a list of parameters from which to determine that an overload is occurring, and a list of ways to prevent the overload.

14

None of these extra limitations nor any others in the independent claims transform the underlying abstract idea—they are all just methods, means, or considerations relevant to the automatic load management idea to which Claim 37 is directed. Indeed, as described by the specification, a person of skill in the art could interchange many of these components within the scope of the invention. *See, e.g.*, '727 Patent at 2:44–59 (varying types of power sources and loads); *id.* at 13:42–64 (discussing power sources of virtually any form); *id.* at 31: 63–65 ("[L]oad limiting circuits are *well known in the art* and include current limit circuits which operate to prevent a current from exceeding its prescribed limit." (emphasis added)).

Many of these same interchangeable elements are also present in the remaining fifty-two dependent claims in addition to other narrowing limitations. *See, e.g., id.* at 15:22–23 (noting that the power grid "refers to any commonly known and used sources of electrical power to homes and businesses"); *id.* at 15:27–31 (stating that the invention could be practiced with a single power source or a plurality of sources); *id.* at 3:1–3 ("[T]here are many types of switching mechanisms that perform such connection and disconnection."). Regardless, most of the dependent claims' limitations are closely linked to automated load management. "[W]hile these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." *Content Extraction*, 776 F.3d at 1349.  For example:

- Claims 5, 6, 7, 25, 26–32, 45–55 recite the various parameters that the invention considers. Claims 6 and 22 also add a current sensing element or ability and various inputs and outputs. And Claims 30–32 additionally provide feedback to the user when it has insufficient power to connect a load.

- Claims 8, 9, 23, 24, 60–62 recite the type of power source being employed, the power source's features, and/or under what conditions the load is connected or disconnected.

- Claims 10, 11, 54, and 56–59 recite ways to measure, store, calculate, and output parameters and maximum power.

15

- Claims 16 and 17 recite the action that the processor takes to head off an overload.

- Claims 18–22 and 27 recite when the calculation of maximum load capability occurs and under what conditions the load is connected or disconnected.

- Claim 33 recites when a disconnected load should be reconnected.

Other limitations are present in the dependent claims that are not specific to automatically managing loads are either mere narrowing limitations that couch the invention in a specific technology field or recite "insignificant post-solution activity will not transform an unpatentable principle into a patentable process." *Diamond*, 450 U.S. at 191–92. For example:

- Claims 34–36, 38 recite the programming in the processor that adds functions, like preventing current from flowing back into the generator or preventing exceeding some maximum current capacity of the power grid.

- Claim 39 recites a generator to charge the battery.

- Claim 40–43 recite a battery specifically for electric cars, effectively couching the invention in a narrower technological field.

These additional and any other limitations that the dependent claims add do not change the character of the claims. None of these dependent claims implementing these or other variations transform the underlying abstract idea of automatic load management. *Cf. Cleveland Clinic*, 859 F.3d at 1360 (finding claims representative even though dependent claims "require[d] specific analytical techniques" or **"**limit[ed] the predetermined comparison values to a single value or representative value or ranges").

### B.     Claim 17 of the '618 Patent is Ineligible

The '618 Patent contains sixty-two claims, five of which are independent claims. The five independent claims recite the same basic components as Claim 37 of the '727 Patent with additions like user configurability and automatic load reconnection that do not alter the underlying abstract idea present in Claim 37.

16

### 1.    *Asserted Claim 17 of the '618 Patent*

Claim 17 of the '618 Patent (an asserted claim, Compl. ¶ 43, ECF No. 1) recites a transfer switch and backup battery, allows for user configurable parameters, and specifies a processor programmed to resupply loads after the overload. While Claim 17 recites a few different parts and arrangements, they are still conventional and do not alter the fact that the claim is directed to the same abstract idea of automated load management without any inventive step or concept.

| Component and Function | Claim |
|---|---|
| Preamble: A backup generator for a building connected to a conventional power grid | 17. In a home or business which receives standard single or multiple phase voltage and frequency A.C. electric power for a group of loads from a primary first power source connected at a service connection in the home or business, a small backup power system comprising: |
| The backup generator is too small to power all the loads. | a second power source providing A.C. electrical power at the same standard voltage and frequency as a first power source connected at a service connection to a home or business and providing power to a group of loads, the second power source not being capable of simultaneously powering all of the loads of the group of loads; |
| A switch that selects the grid or the backup generator. | a transfer switch having an output, a first input coupled to a first power source and a second input coupled to the second power source with the transfer switch operating to select the first or the second power source to provide power via the transfer switch output for at least some loads of the group of loads; |
| A connection to a load | a first load coupler comprising: |
| Between the transfer switch and the load | a) a contactor having one or more each of line and load terminals for wiring the contactor in series in the electric circuit from the transfer switch output to the power input of a corresponding first load, the line terminal receiving power from the transfer switch output and the load terminal providing that power to the first load when the contactor is closed, |
| And supplying power to a computer | b) a power supply having an input responsive to the power at the contactor line terminal and an output for providing power to a processor circuit, |
| The computer controls whether the load is connected | c) the processor circuit executing steps of a program and being coupled to and controlling the contactor to open and close to thereby control coupling of power from the transfer switch output to the first load, the processor circuit normally |

| | causing the contactor to be closed to provide power to the first load, |
|---|---|
| With a user interface for a technician to configure the system | d) a user input circuit coupled to the processor circuit and enabling a user who is an installer to configure the first load coupler to operate with the first load, |
| The computer automatically disconnects the load if there is or could be an overload of the backup generator<br><br>The computer reconnects the load after a time period set by the installer | e) the processor circuit being programmed to cause a load shed in response to at least one of an actual or potential overload of the second power source and further operating to close the contactor to resupply power to the first load after at least a known time period after the load shed with the known time period being responsive to the first load coupler configuration by the installer. |

### 2. The same reasoning for Alice steps 1 and 2 applies to the '618 Patent's Claim 17.

Compared to Claim 37 of the '727 Patent, the '618 Patent's Claim 17 does not "differ in any manner that is material to the patent-eligibility inquiry." *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016). Because Claim 17 only adds conventional components and programs an extra post-solution step, and because these changes do not change the focus of the claims from automated load management or disclose an inventive concept—Claim 17 is invalid under *Alice*'s two-step test.

At *Alice*'s first step, the Court can look past the additional conventional components that Claim 17 employs to confirm that it is also directed to automated load management. *Broadband*, 113 F.4th 1369. Here, the claim recites conventional and generic components without any attendant improvement in these components, including a "transfer switch," a "processor circuit," "first" and "second" power sources, a "contactor," a "power supply," and "user input circuit." '618 Patent at Cl. 1. The "transfer switch" and "processor circuit" are conventional components for the same reasons discussed for Claim 37 of the '727 Patent. *Supra* Part IV.A.1–2. Similarly, the specification explicitly states that some of these things are interchangeable components or are well-known in the prior art, like references to different types of power sources, '618 Patent at 9:34–41,

18

or even referencing Defendants' prior art contactors, *id.* at 6:22–27, 17:58–62. While some claim language refers to components not explicitly described in the specification (e.g., the "power supply" or "user input circuit"), these are merely "[d]escriptions of, and nomenclature pertaining to, elements of the invention . . . given in respect to names of electrical and electronic devices or operations . . . or a descriptive name of a function performed with respect to some device or condition." *Id.* at 9:48–59 (giving a similar "interface circuit" as an example). And the arrangement of these components is conventional for the same reasons discussed above. *Supra* Part IV.A.1–2.

Thus, when these conventional features are removed, only one thing remains as the alleged "advance over the prior art." *Broadband iTV*, 113 F.4th at 1369. Here, that alleged "advance" is "program[ing] to cause a load shed in response to at least one of an actual or potential overload . . . and further operating to . . . resupply power to the first load after at least a known period of time after the first load shed with the known time period." *Id.* at Cl. 17.

This is just another variation on the same algorithmic result from Claim 37—a machine capable of automated load management. Thus, the analogy to the Supreme Court's reasoning in *Parker v. Flook* applies, and the *Michigan Motor Technologies* court's reasoning does, too. Moreover, nothing in the '618 Patent's claims change that the calculations performed by the processor could still "be made using a pencil and paper" to aid in avoiding the maximum "budgeted" power limits of the system. *Intell. Ventures*, 792 F.3d at 1368–69.

That this "claimed advance" contains one more programming step than Claim 37 does not alter ***Alice*'s second step**. The program's additional step of "resupply[ing] power to the first load after at least a known period of time after the first load shed with the known time period" is just "insignificant post-solution activity will not transform an unpatentable principle into a patentable process." *Diehr*, 450 U.S. at 191–92. The applicant described it as something conventional in the

19

prior art. '618 Patent at 17:45–18:3 (describing exemplary "prior art" where "lower priority loads are disconnected for a period of time (e.g. 30 minutes) before the connection is tried again.") "The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance." *Flook*, 437 U.S. at 590. Given that this particular new step—reconnecting the load after time passes—is conventional, its automation by a computer cannot supply any inventive concept.

Moreover, the ability for the user to configure when the reconnection occurs does not amount to an inventive concept. *See, e.g.*, *Affinity*, 838 F.3d at 1272 ("The addition of basic user customization features to the . . . does not add an inventive component that renders the claims patentable."); *P & RO Sols. Grp.*, 273 F. Supp. 3d at 710.

Because Claim 17 only adds conventional components and programs an extra post-solution step, and because these changes do not change the focus of the claims from automated load management or disclose an inventive concept—Claim 17 is invalid under *Alice*'s two-step test.

### 3. The Court can analyze just the '618 Patent's Claim 17 as a representative claim.

The remaining four independent claims recite the same features and components as Claim 17 with few additions or exceptions that do not sway the claims' focus from automated load management. For example:

- Claim 1 focuses on preventing overloads for a single power source and can consider electrical characteristics to detect an overload.

- Claim 31 focuses on preventing overloads for a single power source and also on current rather than power. Moreover, it prevents overloads by limiting current rather than shedding loads.

- Claims 40 and 48 recite backup power sources for multiple load systems, distinguish between high- and low-priority loads, add more specific monitoring capabilities, and allow for more granular configuration of reconnection parameters, all within the context of preventing overloads.

20

Most of these variations merely tack on "well-known, routine, and conventional functions," that, while narrowing the scope of the claims in different ways, do not convey any inventive concept. *Content Extraction*, 776 F.3d at 1349. For example, the prior art already monitored electrical characteristics of the power supply to detect overloads. '618 Patent at 6:40-52 (describing prior art that monitored frequency and sheds load in response). And while Claim 31 prevents overloads by limiting current rather than shedding loads, "load limiting circuits are well known in the art and include current limit circuits which operate to prevent a current from exceeding its prescribed limit." *Id.* at 31:63–65. Moreover, this is really a distinction without a difference, given that both shedding and limiting loads arrives at the patentee's same desired result—preventing overloads. Neither this nor the other limitations transform the underlying abstract idea of automatic load management present in Claim 17.

Similarly, nothing in the remaining fifty-seven dependent claims alters the eligibility analysis. "[W]hile these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." *Content Extraction*, 776 F.3d at 1349. They merely tack on additional, conventional components, or make insubstantial changes that do not change claims' focus from automated load management. For example:

- Claims 2 and 3 recite additional steps for after a second overload's detection. They recite a parameter for determining when a load gets reconnected, (Cl. 2), and disconnecting all lower priority loads before reconnecting a higher priority one, (Cl. 3).

- Claims 4, 18, and 34 recite more specific requirements for the components, like specific voltages or safety-standard qualifications.

- Claims 5, 6, 15, 19, 20, and 28 recite other ways to configure loads. These include naming loads, (Cls. 5, 19), and assigning various types of priority to loads, (Cls. 6, 20). And Claims 15 and 28 allow for user configurability of various components, like the processor circuit, (Cl. 15), and load coupler, (Cl. 28).

21

- Various claims recite additional parameters affecting when and how loads are shed. These include shedding in response to: the duration of certain circuit events, (Cl. 7), the amount and duration of an overload, (Cls. 8, 24), voltage or inadequate voltage, (Cls. 9, 21, 35), current or inadequate current, (Cls. 10, 22, 37, 38), frequencies (Cls. 11, 23, 36, 60), and the total load (Cls. 12, 39).

- Claim 25 recites disconnecting a load based on a drop in frequency and then reconnecting the load after a known amount of time. Claim 26 tacks on a recited user configurable amount of time, and Claim 27 recites an amount of time responsive to the user-assigned load priority.

- Claims 32 and 33 recite strategies of avoiding overloads by limiting current.

- Claims 41–47, 61, and 62 do not add any new components, and instead merely limit combinations of the different independent claim elements the processor circuit is responsive to in Claim 40. Claims 61 and 62 additionally specify the frequency represents the amount of power drawn, (Cl. 61), and that the degree of overload is responsive to the amount of frequency and the length of the deviation, (Cl. 62).

- Claims 49–51 recite components for measuring various parameters. For example, Claim 49 recites identifying overloads at the backup generator based on frequency and shedding loads in response to changes lasting longer than a known time period. The remainder recite a current transformer to measure current output, (Cl. 50), and current transformers in the current sensing circuit that can determine power output, (Cl. 51).

Additional limitations present in the dependent claims that are not specific to automatically managing loads are either mere narrowing limitations that couch the invention in a specific technology field or recite "insignificant post-solution activity will not transform an unpatentable principle into a patentable process." *Diamond*, 450 U.S. at 191–92. For example:

- Claims 13, 14, 16, 30, and 41 recite additional parameters for when to reconnect a load, including user-configurable times, (Cl. 13), the priority of the first load, (Cl. 14), one or more of voltage, frequency, total load, or total current, (Cls. 16, 30), and whether reconnecting would cause another overload, (Cl. 41).

- Certain dependent claims recite exceptionally narrowing limitations. For instance, Claim 29 recites a microcontroller and adequate power for it. Similarly, Claim 52 recites a load output connection to control an air condition compressor.

- Claims 53–58 all recite different ways of determining and storing current values under differing circumstances, including from a generator, (Cl. 53), from a utility, (Cl. 54), for power drawn after a load is turned on, (Cl. 55), for starting current after a load is turned on, (Cl. 56), average current, (Cl. 57), when the load is turned off, (Cl. 58), and to update the these stored values, (Cl. 59).

22

These additional and any other limitations that the dependent claims add do not change the character of the claims. "[W]hile these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." *Content Extraction*, 776 F.3d at 1349. Thus, none of these dependent claims transform the underlying abstract idea of automatic load management.

## C.     Claim 1 the '857 Patent is Ineligible

The '857 Patent contains seventy-one claims, nine of which are independent claims. The nine independent claims recite the same basic components as Claim 37 of the '727 Patent with alterations like its application to non-utility type power sources and managing overload conditions by adjusting A.C. frequency.

### 1.     *Asserted Claim 1 of the '857 Patent*

Claim 1 of the '857 Patent (an asserted claim, Compl. ¶ 55, ECF No. 1) recites a non-utility power source with a maximum output power parameter and an output frequency that changes under overload conditions. When the processor recognizes such an overload condition, it controls the power consumed by one of the loads to alleviate the overload. But these differences do not alter the underlying abstract idea present in Claim 37. All of these differences track with a claim directed to the abstract idea of automatic load management, that is, they detect overload conditions and prevent the overload from occurring.

| Component and Function | Claim |
| --- | --- |
| Preamble | 1. A power system which provides A.C. power with a controlled A.C. frequency to assist in managing the loading thereof, the power system comprising: |
| A backup generator with a maximum output power and controllable frequency | a) a non-utility type power source comprising an inverter which provides single or multiple phase output A.C. power to one or more of a plurality of loads, the power source having at least one maximum output power parameter which if exceeded causes an overload of the power source, the output A.C. power |

23

| | having an A.C. frequency, which frequency is controlled in response to the timely amount of the output A.C. power; |
|---|---|
| Controlling the frequency when the generator is or about to be overloaded. | b) a power sensing circuit which may be part of the power source or otherwise and is responsive to the timely amount of the output A.C. power, the power source operating in response to the power sensing circuit to control the frequency of the output A.C. power to have a first frequency when the power source is not overloaded and a second frequency when the power source is overloaded or is near to being overloaded; |
| A computer automatically shedding load in response to the frequency change | c) a processor circuit comprising one or more processors responsive to the output A.C. power, the processor circuit operating in response to the occurrence of the second frequency to control the output A.C. power consumed by at least one load of the one or more loads thereby helping to prevent or alleviate an overload of the power source. |

### 2. The same reasoning for Alice steps 1 and 2 apply to the '857 Patent's Claims.

Compared to Claim 37 of the '727 Patent, the '857 Patent's Claim 1 does not "differ in any manner that is material to the patent-eligibility inquiry." *Mortg. Grader*, 811 F.3d at 1324 n.6. Claim 1 specifies different conventional parts and the a mechanism for detecting potential overloads and preventing overloads, but these differences do not change the *Alice* analysis.

At ***Alice*'s first step**, the Court can look past the additional conventional components that Claim 1 employs to confirm that it is also directed to automated load management. *Broadband*, 113 F.4th 1369. Here, the recited components include a "processor circuit," "processors," an "inverter," and a "power sensing circuit." '857 Patent at Cl. 1. The "processor circuit," "processors," and "inverter" are disclosed in the prior art, as explained by the patent and above, *supra* Part IV.A.1–2. Moreover, the "power sensing circuit" is simply a "descriptive name of a function performed with respect to some device" which, as the patent explains, is "well known to one of ordinary skill." '857 Patent at 9:54–60. Indeed, "[m]any prior art generator systems incorporate digital engine and alternator control systems which incorporate monitoring of the

24

performance of the generator." *Id.* at 23:13–15. The arrangement of these components is conventional for the same reasons discussed above. *Supra* Part IV.A.1.

Thus, when these conventional features are removed, only one thing remains as the alleged "advance over the prior art," *Broadband iTV*, 113 F.4th at 1369—a processor "operating in response to the occurrence of the second frequency to control the output A.C. power consumed by at least one load of the one or more loads thereby helping to prevent or alleviate an overload of the power source." *Id.* But this is just another variation on the same algorithmic result from Claim 37—a machine capable of automatic load management. The same general steps are being performed to prevent overloads: (1) detect overload conditions and (2) take some action to prevent an overload. Thus, the same analogy to the Supreme Court's reasoning in *Parker v. Flook* applies, and the *Michigan Motor Technologies* court's reasoning does, too. Moreover, nothing in the '857 Patent's claims change that the calculations performed by the processor could still "be made using a pencil and paper" to aid in avoiding the maximum "budgeted" power limits of the system. *Intell. Ventures*, 792 F.3d at 1368–69.

Claim 1 adds that its system "control[s] the frequency of the output A.C. power to have a first frequency when the power source is not overloaded and a second frequency when the power source is overloaded or is near to being overloaded." '857 Patent at Cl. 1. That Claim 1 is more specific about the frequency of A.C. power as the means through which the computer identifies overload conditions does not alter the § 101 analysis. The patentee explained during prosecution that this is merely "us[ing] frequency of the AC power wording [sic] in conjunction with conveying loading (or overloading) information." Ex. B, U.S. Appl. No. 16/952,007, Applicant Remarks at 5 (Dec. 7, 2022). But this was already a conventional means in the prior art. *Id.* at 6:28–52 (describing a prior art generator controlling the frequency to communicate overloading

25

Case 2:24-cv-01270-PP     Filed 12/02/24     Page 29 of 35     Document 9

information to a load manager); *see also* ("In other prior art systems such as that of FIG. 3 certain lower priority loads are connected but are all immediately disconnected if the frequency of the AC power from the generator drops as a result of an overload."). The claim merely recites the same general steps using conventional means: use a computer to (1) detect overload conditions and (2) automatically take some action to prevent an overload. The use of frequency just limits the invention to one kind of electrical backup generator. This is insufficient to defeat the abstract idea, given that the Supreme Court "established that limiting an abstract idea to one field of use" does "not make the concept patentable." *Bilski*, 561 U.S. at 612.

At *Alice*'s second step, these changes fail to identify an inventive concept. The Supreme Court "rejected the argument that 'implement[ing] a principle in some specific fashion' will 'automatically fal[l] within the patentable subject matter of § 101.'" *Alice*, 573 U.S. at 222 (quoting *Flook*, 437 U.S. at 593). But that is what Claim 1 attempts to do—it attempts to automatically shed loads through a conventional means of signaling the computer (by changing the frequency of the power output) when an overload is occurring. Thus, restricting the claim only to systems that send a signal via frequency variation is not an inventive concept, so Claim 1 lacks an inventive concept. Because Claim 1 only specifies conventional parts and the particular mechanisms for detecting potential overloads and preventing overloads, and because these differences do not change the *Alice* analysis as conducted for Claim 37 of the '727 Patent, Claim 1 is invalid.

### 3. The Court can analyze just the '857 Patent's Claim 1 as a representative claim.

The remaining eight independent claims recite the same features and components as Claim 1 with few additions, failing to shift these claims' focus from automatic load management. The patentee argued that the claims were indeed related, explaining that "all of the 71 instant claims are related by the wording AC power (and similar wording)." Ex. B, U.S. Appl. No. 16/952,007, Applicant Remarks at 5 (Dec. 7, 2022). Moreover, "[w]here differences exist between the

independent claims, such as the addition of" additional parameters to consider when evaluating loading conditions or making decisions, "they do not change the concept of Claim 1 of the" '857 Patent "or add inventiveness such that Claim 1 . . . cannot be representative. *BoardActive Corp. v. Foursquare Labs, Inc.*, No. 1:22-CV-00597-JDW, 2023 WL 2587688, at *2 (D. Del. Mar. 21, 2023). For example:

- Claim 17 specifies the addition of DC to AC inverters, and it alters the overload scenario to look for excessive current that is supplied for too long.

- Claim 21 is for an electronic power system that further claims a coupling circuit, where the coupling is responsive to the frequency output of the AC power.

- Claim 27 recites a timely operating parameter for determining whether an overload occurs, and also performs coupling to prevent or mitigate an overload.

- Claim 34 is similar to Claim 27 but adds another coupling circuit. The first coupling circuit mitigates overloading of the power source, and the second coupling circuit couples the AC power to at least the second load and may perform one of preventing, alleviating, or preventing further overloads.

- Claim 39 broadens the overload indicator to a power system parameter (rather than a maximum output parameter, compare Cl. 1).

- Claim 45 specifies several types of power sources, including rechargeable power storage system, vehicle battery, solar PV, other renewable systems, or internal combustion generators. The frequency can be controlled by the power source for synchronization or in response to loading the power source. Finally, Claim 45 includes within the definition of "overloaded" excessive current that (if continued for long enough) may damage the power source.

- Claim 61 recites use of one or more controlled power parameters to assist in loading. These parameters include a maximum power source parameter, a timely power parameter, which is changeable. The processor is responsive to the change in frequency to control the coupling of the loads to prevent an overload.

- Claim 66 recites a power generating circuit that outputs a "sinusoidal single or multiple phase AC power," and notes that it may be coupled to a plurality of loads based on various parameters. The frequency is controlled in response to the grid power frequency when both power sources are parallel, and when not parallel, its frequency represents the loading of the source.

None of these extra limitations nor any others in the independent claims transform the underlying abstract idea of automatic load management present in Claim 1 of the '857 Patent. The

27

additional limitations cited by these claims merely tack on ancillary limitations that narrow the scope of the claim, but do not alter the claimed advance as being one directed to automatic load management. *Cf. Cleveland Clinic*, 859 F.3d at 1360 (finding claims representative even though dependent claims "require[d] specific analytical techniques" or "limit[ed] the predetermined comparison values to a single value or representative value or ranges"). Indeed, some limitations (like the particular type of control circuit used) are interchangeable. '857 Patent at 32:14–16.

Similarly, nothing in the remaining sixty-two dependent claims alters the eligibility analysis. "[W]hile these claims may have a narrower scope than the representative claims, no claim contains an 'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." *Content Extraction*, 776 F.3d at 1349. For example:

- Most of the Claims (2, 4–5, 18–19, 20, 22–25, 28–33, 35–38, 40–43, 49–50, 52, 54, 58–60, 65, and 67–71) recite specific components, parameters, or conditions that relate to the system (or to which the system is responsive). These include frequencies, (Cls. 2, 54, 69, 70, 71), power from an internal combustion engine, (Cl. 4), power from diverse sources, (Cl. 65), a rechargeable battery, (Cl. 5), the power source's operating condition, (Cl. 22), voltage considerations, (Cls. 19, 23, 28, 29, 35, 36, 40, 41, 58, 59, 60, 68, 70), current considerations, (Cls. 20, 30, 31, 37, 38, 42, 43, 49, 50, 52, 59, 60), sine wave distortion, (Cls. 24, 71), AC power wattage, (Cls. 25, 32, 33), an overloaded versus not overloaded state, (Cls. 18, 52), and the power source loading, (Cl. 67).

- Claims 26, 44, and 55 recite limitations relating to coupling circuits and their configurability.

Moreover, some variations merely tack on "well-known, routine, and conventional functions" and features that, while narrowing the scope of the claims in different ways, do not convey any inventive concept. *Content Extraction*, 776 F.3d at 1349. For example:

- Claims 13–15 recite a transfer switch and its related functionality. These include selecting the grid or a power source depending on certain parameters, (Cl. 13), specifying current sensing capability, (Cls. 14, 15), and controlling charging to a battery, (Cl. 16).

- Claims 56–57, 69–70 recite additional load manager features. These include managing loads based on priority and timing, (Cl. 56), distinct processors that manage loads based on frequency, (Cl. 57).

- Claims 6 and 7 recite battery charging and control. Claims 8–12 do too, and additionally recite the selection and other sources for the charging, including solar panels, (Cls. 8, 10), internal combustion engines, (Cls. 9, 11), or both, (Cl. 12).

- Claims 62–63 and 68 recite additional hardware related components, like a processor, (Cl. 62), processor circuit with printed circuit assembly with a user interface, (Cl. 63), and multiple dedicated and discrete processors with specific functions, (Cl. 64).

Finally, certain dependent claims "simply recite the claims . . . in a specific technological environment," making claims "no different in substance." *Cambridge Mobile Telematics, Inc. v. Zendrive, Inc.*, No. CV 22-1260-RGA, 2023 WL 4850567, at *4 (D. Del. July 28, 2023), *report and recommendation adopted,* No. CV 22-1260-RGA, 2023 WL 6295338 (D. Del. Sept. 27, 2023). For example:

- Claims 3 recites using the claimed power source as a backup, (Cl. 3), and Claim 51 recites isolating certain loads to a backup when a power grid fails, (Cl. 51).

- Claims 46–48, 53, and 65 recite renewable energy related limitations. For instance, they recite limitations related to synchronization, (Cl. 46), disconnection when grid power is not available, (Cl. 47), a sub-panel used to power a plurality of loads, (Cl. 48), sending excess power generated back to the power grid, (Cl. 53).

None of the dependent claims "differ in any manner that is material to the patent-eligibility inquiry," *Mortg. Grader*, 811 F.3d at 1324 n.6, namely whether they are directed at patent-ineligible subject matter or disclose an inventive concept. Indeed, many of these limitations are also disclosed or described as being interchangeable in the specification. *See, e.g.*, '857 Patent at 13:45–67 (discussing power sources of virtually any form). Thus, none of these dependent claims transform the underlying abstract idea of automatic load management.

## D. The § 101 Inquiry is Ripe

This motion is ripe. The Court need not credit the token allegations of novelty and inventiveness in PSLC's Complaint. *Simio*, 983 F.3d at 1365 ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6)."); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) ("[A]llegation[s] about inventiveness, wholly divorced from the claims or the specification, do[] not defeat a motion to dismiss; only plausible and specific factual allegations that aspects of the claims are inventive are sufficient." (internal

quotations omitted)). Nor are there any factual disputes about novelty or unconventionality that preclude resolution for a simple reason: claims that simply apply the underlying abstract idea, like the representative claims do here, do not require investigations of conventionality. *BSG Tech*, 899 F.3d at 1291 ("Here, the only alleged unconventional feature of BSG Tech's claims is the requirement that users are guided by summary comparison usage information or relative historical usage information. But this simply restates what we have already determined is an abstract idea."). Finally, claim construction is not a barrier to the patent eligibility analysis. *Content Extraction & Transmission LLC v. Wells Fargo Bank. Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). No potential construction can alter the fact that the plain language of the representative claims is directed to abstract ideas.

## V.   CONCLUSION

For these reasons, the Court should grant Generac's Motion to Dismiss for Failure to State a Claim and dismiss PSLC's Complaint.

Dated: December 2, 2024

Respectfully submitted,

FISH & RICHARDSON P.C.

By: */s/ David B. Conrad*
    Neil J. McNabnay
    mcnabnay@fr.com
    David B. Conrad
    conrad@fr.com

    1717 Main Street, Suite 5000
    Dallas, Texas 75201
    (214) 747-5070 - Telephone
    (214) 747-2091 – Facsimile

**COUNSEL FOR DEFENDANT**
**GENERAC POWER SYSTEMS, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 2, 2024, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ David B. Conrad*
David B. Conrad

31