## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

PSLC LLC

      *Plaintiff,*

v.

GENERAC POWER SYSTEMS, INC.,

      *Defendant.*

C.A. No. 2:24-cv-01270-PP

## GENERAC POWER SYSTEMS, INC.'S
## <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE ASSERTED PATENTS ............................................................................... 1

III.    LEGAL STANDARDS ........................................................................................ 2

IV.     UNDISPUTED CLAIM TERMS ........................................................................ 3

V.      DISPUTED CLAIM TERMS .............................................................................. 4

        A.      The '727 Patent's Terms ........................................................................ 4

                1.      "the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch." ('727 Patent, Claim 13) ........................................................................ 4

                2.      "the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter." ('727 Patent, Claim 37) .............. 11

        B.      The '618 Patent's Terms ........................................................................ 12

                1.      "small backup power system" ..................................................... 12

                2.      "terminal" ................................................................................... 12

                3.      "via the connection or sensor coupled to the line connection" ........................ 13

                4.      "the priority" .............................................................................. 14

                5.      "unavoidable electronic circuit propagation delay time duration" ................... 16

                6.      "the drop in frequency representing a known amount of power being supplied by the second power source" ..................................... 19

                7.      "The load coupler device of claim 1 wherein the processor circuit causes a load shed in response to the amount of total load on the power source, the amount of total load being determined by an electronic circuit which is part of a control system of the power source" ................................................ 21

                8.      "The load coupler device of claim 1 wherein before the processor circuit would otherwise close the contactor to resupply power to the first load when the known time period elapses, in response to one or more of:  i) the voltage of the power provided to and sensed at the contactor line connection, ii) the frequency of the power provided to and sensed at the contactor line connection, iii) the total load on the power source, iv) or, via a current transformer, the total current being supplied by the power source, the processor first determines at least one of whether the power source is already overloaded or if connecting the first load

i

will cause the power source to become overloaded, and if one of these conditions exists, the processor does not close the contactor thus preventing the first load from being connected to the power source" ........................................ 24

    9.   "responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection" ....................................................................................... 26

C.   The '857 Patent's Terms ........................................................................... 28

    1.   "sine wave distortion" / "sine distortion" ........................................... 28

D.   Common Terms ......................................................................................... 30

    1.   "power grid" .......................................................................................... 30

VI.   CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)...................................................................12

*Advanced Ground Info. Sys. Inc. v. Life360, Inc.*,
    830 F.3d 1341 (Fed. Cir. 2016).................................................................5, 6

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011)...............................................................29, 30

*Aristocrat Techs. Australia Pty Ltd. v. Intl's Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)...................................................................10

*B. Braun Med. Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997).....................................................................5

*Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*,
    2019 WL 497902 (E.D. Tex. Feb. 7, 2019) ................................................22

*Datamize LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)...................................................................14

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)...................................................................16

*Dig. Retail Apps, Inc. v. H-E-B LP*,
    2020 WL 376664 (W.D. Tex. Jan. 23, 2020) ...........................................14, 15, 16

*Dow Chemical Co. v. Nova Chemicals Corp.*,
    803 F. 3d 620 (Fed. Cir. 2015)....................................................................10

*E.I. du Pont De Nemours & Co. v. Unifrax I LLC*,
    921 F.3d 1060 (Fed. Cir. 2019).....................................................................3

*EON Corp. IP Holdings LLC v. AT & T Mobility LLC*,
    785 F.3d 616 (Fed. Cir. 2015)...................................................................9, 11

*Function Media, LLC v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013).....................................................................8

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244, 85 USPQ2d 1654 (Fed. Cir. 2008) ....................................7, 14

*Halliburton Oil Well Cementing Co. v. Walker*,
329 US 1 (1946)................................................................................4

*Harris Corp. v. Ericsson Inc.*,
417 F.3d 1241 (Fed.Cir.2005)..........................................................8

*Infinity Computer Prod., Inc. v. Oki Data Americas, Inc.*,
987 F.3d 1053 (Fed. Cir. 2021)..................................................17, 19

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)..................................................14, 27

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)........................................................22

*IQASR LLC v. Wendt Corp.*,
825 F. App'x 900 (Fed. Cir. 2020) .............................................17, 19

*In re Katz Interactive Call Processing Pat. Litig.*,
639 F.3d 1303 (Fed. Cir. 2011)........................................................22

*Lites Out, LLC v. OutdoorLink, Inc.*,
2017 WL 4882613 (E.D. Tex. Oct. 30, 2017) (Mazzant, J.) ................14

*Mantissa Corp. v. First Fin. Corp.*,
No. 2022-1963, 2024 WL 607717 (Fed. Cir. Feb. 14, 2024) ................17

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)..........................................................................2

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)..............................................................2

*MasterMine Software, Inc. v. Microsoft Corp.*
874 F.3d 1307 (Fed. Cir. 2017)..............................................23, 24, 26

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
248 F.3d 1303 (Fed. Cir. 2001)..........................................................9

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
520 F.3d 1367 (Fed. Cir. 2008)........................................................21

*Midwest Athletics and Sports Alliance LLC v. Xerox Corp.*,
2020 WL 7692767 (W.D.N.Y. 2020) .................................................13

*Nautilus, Inc. v. Biosig Instrs., Inc.*,
572 U.S. 898 (2014)..................................................................20, 26

iv

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008)................................................................4

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)..........................................1, 12, 28, 30

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................................2, 3, 28

*Rembrandt Data Techs., LP v. AOL, LLC*,
   641 F.3d 1331 (Fed. Cir. 2011).........................................................22, 23

*RightQuestion, LLC v. Samsung Elecs. Co.*,
   2022 WL 1154611 (E.D. Tex. Apr. 18, 2022)......................................23

*Sensor Electronic Technology, Inc. v. Bolb, Inc.*,
   2019 WL 4645338 (N.D. Cal. 2019) ....................................................13

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015)..............................................10, 19, 20

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*,
   681 F. App'x 898 (Fed. Cir. 2017) .......................................................26

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)............................................................12

*UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*,
   816 F.3d 816 (Fed. Cir. 2016).........................................................21, 22

*Wavetronix LLC v. EIS Elec. Integrated Sys.*,
   573 F.3d 1343 (Fed. Cir. 2009)..............................................................2

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) (en banc).................................5, 7, 11

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)..........................................................7, 8

*WSOU Investments LLC v. Google LLC*,
   2023 WL 6889033 (Fed. Cir. Oct. 19, 2023).....................................6, 7

**Statutes**

35 U.S.C. § 112 ¶ 6 ................................................................... *passim*

# I. INTRODUCTION

Generac Power Systems, Inc.'s claim constructions reflect the meaning of the terms at issue based on the claim language, specification, and prosecution history, where it can be determined, and identifies fatal defects in the claim where it cannot. Plaintiff PSLC's constructions are either contradicted by the intrinsic evidence, or they achieve nothing not already accomplished by the claims' plain language without construction. As such, the parties have raised issues of claim scope that the Court must resolve. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). Generac respectfully requests that the Court adopt each of its proposed constructions.

# II. THE ASSERTED PATENTS

PSLC asserts U.S. Patent Nos. 10,879,727 (the "'727 Patent"), 10,892,618 (the "'618 Patent"), and 11,967,857 (the "'857 Patent") (collectively, the "Asserted Patents"). The '727 Patent is a parent of the '618 and '857 Patents. All three share the same specification and are in the field of managing power sources (i.e., a municipal grid, backup power generator, or solar panel), '727 Patent at Abstract, or managing loads (i.e., devices), *id.* at 2:28–30. A power source can only supply power for so many loads because it "has a maximum load handling capability dictated by the power generation and delivery path . . . or a maximum output." *Id.* at 2:4–27.

The management of loads in the presence of overload conditions was not new. *Id.* at 6:9–25 ("Load managers for load shedding are commercially available."). Indeed, the patents even point to an existing switch from Generac that monitored AC frequency and added or removed a load on a backup generator when the frequency dropped, indicating an overload. *Id.* at 6:9–50.

1

The patents explain the inventor's goal: "there is a need to determine and control which and how many loads are connected in order that the total of the loads does not create an overload." '727 Patent at 2:13–15. "Overloads are generally undesirable in that they may cause deviation from power output specifications, loss of power, damage or combinations thereof." *Id.* at 2:15–19.

The patentee purportedly accomplished its goal by attempting to avoid overloads through automated "connection and disconnection of individual loads," *id.* at 8:66–9:1, so "that the total load on any one power source is kept at or below the maximum output capability of that power source," *id.* at 9:62–64. The solution would "sense" and use the "conditions which affect that maximum available output power" with information about the power source "to determine precisely what that maximum available output power is at a given time, what the expected available power will be at one or more times in the future as well as the present and future effect the connection of a particular load may have on available power." *Id.* at 9:9–17.

## III.    LEGAL STANDARDS

Claim construction is a pivotal procedure where the Court determines the meaning of the words used in the asserted patent claims as a matter of law, and those definitions are then used to determine infringement and validity. *See Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 996 n.7 (Fed. Cir. 1995). By resolving disputes as to the meaning and scope of the asserted claims, the Court will allow the parties to enter discovery with increased certainty as to what is needed for each party to prove their case. *See, e.g.*, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

Claim construction requires examining the words of the claims to determine the scope of a patented invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). The words of the claims are generally given the "ordinary and customary meaning" that they "would

2

have to a person of ordinary skill in the art in question at the time of the invention" "in the context of the entire patent, including the specification." *Id.* The specification—the part of the patent preceding the claims describing the invention—provides the "single best guide to the meaning of a disputed term" and is usually dispositive of a term's meaning. *Id.* at 1315. The entire intrinsic record, including the specification and prosecution history, must be examined when determining the meaning of a claim term. *Id.* at 1315–16; *see also E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1068 (Fed. Cir. 2019).

## IV. UNDISPUTED CLAIM TERMS

| Patent(s) | Term | Agreed Construction |
|---|---|---|
| '727, '618, and '857 Patents | overload | "a load that if not disconnected or otherwise prevented will either cause a departure from specifications for the power output from the power source, for example such as a deviation of AC power voltage or frequency for longer than a specified time period, a loss of power such as from a tripped circuit breaker, or damage such as overheating or exceeding mechanical stress limits" |
| '857 Patent | parameter | "a quantity of one or more property or attribute (e.g. of a device, physical property, substance or environment) which is treated as a constant" |
| '727, '618, and '857 Patents | timely | "instant, real time, close to real time or a suitable time" |
| '618 Patent | known | "to have been previously stored in a memory and available e.g. having been previously manufactured with, programmed with or measured" |

## V.    DISPUTED CLAIM TERMS

### A.    The '727 Patent's Terms

1. *"the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch." ('727 Patent, Claim 13)*

| Generac | PSLC |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6—Indefinite.<br><br>**Function:** timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch<br><br>**Structure:** None. | Plain and Ordinary meaning. Plaintiff's Alternative Proposed Function and Corresponding Structure to the Extent the Court Requires Section 112(6) Treatment of the Phrase:<br><br>**Function**: timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch<br><br>**Structure**: processor circuit, as set forth in '727, Col. 27, l. 61 through Col. 28, l. 29 et seq., and associated hardware for executing the identified claim language or similarly worded operations found in the specification, and equivalents thereto |

Claim 13 is subject to 35 U.S.C. § 112 ¶ 6 and is indefinite because the term "processor circuit" does not have a definite structure and the '727 Patent's specification discloses no "algorithm for performing the claimed function." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008). Plaintiff's proposed structure is insufficient because it does not identify any algorithm for performing the claimed functions the "processor circuit" is "programmed to" perform.

In patent law, functional claiming is disfavored because it monopolizes means for achieving a result even if the inventor did not invent it. *Cf. Halliburton Oil Well Cementing Co. v. Walker*, 329 US 1, 12 (1946) ("[T]here may be many other devices beyond our present information

4

or indeed our imagination which will perform that function and yet fit these claims. And unless frightened from the course of experimentation by broad functional claims like these, inventive genius may evolve many more devices to accomplish the same purpose."). Congress authorized an exception under § 112 ¶ 6, but with a trade-off. If a term is subject to § 112 ¶ 6, it is limited to the corresponding structure, material, or acts described in the specification. *Advanced Ground Info. Sys. Inc. v. Life360, Inc.*, 830 F.3d 1341, 1346 (Fed. Cir. 2016). But "[i]f the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid that price but is . . . attempting to claim in functional terms unbounded by any reference to structure," *id.* (quoting *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003)), which renders the claim indefinite under § 112 ¶ 6. *See B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("Th[e] duty to link or associate structure to function is the quid pro quo for the convenience of employing § 112, ¶ 6.").

### *The term "processor circuit" is subject to § 112 ¶ 6*

First, "processor circuit" is subject to § 112 ¶ 6 because it does not have a sufficiently definite meaning. Although this claim limitation is presumed not to be in means-plus function format because it lacks the word "means for," the language of the patent shows that this limitation only describes purely functional language, with a made-up "processor circuit" as its purported structure. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015) (en banc) (explaining the rebuttable presumption exists but is not "strong").

It does not matter whether the words in the term—"processor" and "circuit"—are individually known in the art. The application of § 112 ¶ 6 depends on the specific context of this patent. *See Life360, Inc.*, 830 F.3d at 1348 (looking to the "combination of the terms *as used in the context of the relevant claim language*" "[i]rrespective of whether the terms . . . are terms of art in computer science") (emphasis added). Here, the named inventor was his own lexicographer

5

and defined a "processor circuit" such that the term, "by itself, does not identify a structure." *Id.* The inventor stated that "processor circuit" "will include a processor," but also "will also include supporting circuitry" comprising "various elements" to achieve its functions. '727 Pat., 27:60– 28:14. This arbitrary selection of "supporting circuitry" and "various elements" leaves his definition open-ended and left up to the imagination of the reader.

This arbitrariness can be seen in the section of the specification Plaintiff relies upon. It states that "[t]he processor circuit may be implemented with ***any type(s) of circuit devices*** currently known ***or which will become to be known*** in the electronic control systems art ***including but not limited*** to analog and digital circuits, LSI, VLSI, ASIC, PLD, CPLD, FPGA, DSP, IP Core, Array, microcontroller, microprocessor, Multicomputer, RISC or CPU integrated circuits." *Id.* at 28:8-14 (emphasis added). Further, it explains, "[e]xamples of such computer circuits ***include*** PCs using Windows, Linux or other operating systems, Apple products such as iPhone, iPad, iPod, Android product such as the Asus Eee Pad tables, various RISC, parallel microcomputer and embedded devices," and may even "be implemented by multiple circuits or devices as desired." *Id.* at 28:22-26 (emphasis added).

Thus, even if a "processor" or "circuit" might individually in some circumstances have structure, the inventor here created a new generic term that goes beyond a "processor" and includes whatever arbitrary "supporting circuitry" and "various elements" are needed to perform the claimed function. He defined a "processor circuit" so broadly as to generically be any structure that manipulates data in computer control systems, or even a combination of any such structures. *See WSOU Investments LLC v. Google LLC*, 2023 WL 6889033 at *4 (Fed. Cir. Oct. 19, 2023) (finding "processor" subject to 112 ¶ 6 where the "specification treats the word 'processor' so broadly as to generically be any structure that manipulates data"). Plaintiff's proposed structure is

similarly indefinite, as it too includes whatever "associated hardware for executing the identified claim language."

Finally, "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348–49 (Fed. Cir. 1999).[1] Here, the claimed "processor circuit" must, among other things, be "programmed to . . . prevent exceeding the maximum output current capacity of the power source." '727 Pat, cl. 17. Although claim language could provide structure by reciting the steps of an algorithm for the computing system, the foregoing is not an affirmative step of an algorithm. Rather, ***it claims the desired functional result right at the point of alleged novelty***: preventing an overload instead of reacting to one. *See id.* at 8:57–9:4 ("The present invention . . . can prevent overloading"); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255, 85 USPQ2d 1654, 1663 (Fed. Cir. 2008) (noting the Supreme Court explained that a vice of functional claiming occurs "when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty") (quoting *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938)). In short, the "processor circuit" is the purported invention, it is defined and claimed by the inventor as a specially programmed generic computer, and the claim does not recite the structural steps of its programming to achieve its functional result; it is therefore subject to § 112 ¶ 6. *See Williamson*, 792 F.3d at 1349 (finding term subject to § 112 ¶ 6 where it "is simply a generic description for software or hardware that performs a specified function.").

---

[1] An algorithm is "a finite sequence of steps for solving a logical or mathematical problem or performing a task." Manual of Patent Examination Procedure (MPEP) § 2181(II)(B).

### *The specification fails to disclose an algorithm for the claimed functions*

Because this limitation is subject to § 112 ¶ 6, the specification must adequately disclose an algorithm for performing the claimed functions. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) ("When dealing with a special purpose computer-implemented means-plus-function limitation we require the specification to disclose the algorithm for performing the function." (quotation omitted)).

A "computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed.Cir.2005) (emphasis added); *see also WMS Gaming, Inc. v. Internat'l Game Tech.*, 184 F.3d 1339, 1349 (Fed.Cir.1999) (holding in a means-plus-function claim "in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm"). The disputed "processor circuit" limitation recites two functions: communicate with loads or corresponding load modules to (1) "control the current consumed" by the power source so thereby to (2) "prevent exceeding the maximum output current capacity of the power source." '727 Patent at Claim 13. An algorithm must be disclosed for each.

The first function corresponds to communicating with "load limiting circuits." These "include current limit circuits which operate to prevent a current from exceeding its prescribed limit." *Id.* at 31:63–32:3; *see also id.* at 32:4-5 ("a load limit (or current control) device limits the power supplied to a device"). As opposed to a simply switching the power on or off, a load limiting device as one that modularly limits the current, analogous to a "light dimmer switch commonly found in the home," *id.* at 31:56-67, rather than an on/off switch. *Id.* at 3:13–18 ("If the teaching is with respect to controlling the amount of current or load (as compared to simply switching the

8

current or load on or off) … a simple on/off type of switch is not meant."). The portion of the specification Plaintiff proposes as structure does not correspond to this function.

But more importantly, it is not enough for the "processor circuit" to communicate with a "load limiting circuit." The second function expressly requires that controlling the current will "prevent exceeding the maximum output current capacity of the power source." It is not enough for a disclosed structure to simply be "capable of" performing the function recited in the means-plus-function limitation. *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.,* 248 F.3d 1303, 1311-12 (Fed. Cir. 2001). The specification must recite an algorithm that is a series of steps that would achieve this allegedly novel result. It is not a basic function of a processor. *See EON Corp. IP Holdings LLC v. AT & T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015) ("A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm."). The portions of the specification Plaintiff points to do not disclose any such algorithm.

For example, the specification notes that a "given power source has a maximum load handling capability dictated by the power generation and delivery path (e.g. pressure, voltage, pip size, wire size) or a maximum output (dictated by the design of the power source and the system it is used in)." *Id.* at 2:24–28. But the specification does not define anywhere what, exactly, a "maximum output ***current capacity***" is. Also, when speaking of maximum outputs generally, the specification does not describe them as a definite thing. It notes that these kinds of parameters vary and are "generally dependent upon many factors." *Id.* at 3:47–4:17. In fact, there might be multiple "maximums" for a power source. *Id.* at 10:9–21. There might be a "safe" maximum, which depends upon certain factors. *Id.* at 3:56–62. Or perhaps one rating for when used "as a backup source" and another for "use as a prime power source," which differ. *Id.* at 3:67–4:4. The

9

specification notes that "maximums" "may at times change or be adjusted." *Id.* at 10:9–21. It also might depend upon the "duration of the load." *Id.* at 3:47–55.

The specification does not provide an algorithm for how the "processor circuit" determines what "maximum output ***current capacity***" is or which such "maximum" to use. Sketching the invention's scope is particularly important "where different approaches to measurement are involved." *Dow Chemical Co. v. Nova Chemicals Corp.*, 803 F. 3d 620, 630–631 (Fed. Cir. 2015); *see, e.g.*, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) (holding claim indefinite where "molecular weight" could be measured three different ways and yield different results, and the intrinsic record does not provide guidance on which one to use).

Nor does the specification describe what steps the "processor circuit" takes with that information. The specification's length and the skill of a person of ordinary skill in the art are not substitutes for providing a corresponding algorithm to perform the claimed function. *See Aristocrat Techs. Australia Pty Ltd. v. Int'l's Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008) ("Aristocrat's real point is that devising an algorithm to perform that function would be within the capability of one of skill in the art, and therefore it was not necessary for the patent to designate any particular algorithm to perform the claimed function. As we have noted above, however, that argument is contrary to this court's law.").

In sum, Claim 13 recites a functional limitation claiming a result right at the point of alleged novelty. Plaintiff's proposed structure includes no algorithm by which a processing circuit can be programmed to perform this function and achieve this result. And such an algorithm cannot be found elsewhere in the specification. The failure of the '727 Patent to provide any definite, corresponding algorithm for performing the claimed functions of this means-plus-function claim thus renders Claim 13 indefinite.

10

**2.** *"the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter." ('727 Patent, Claim 37)*

| Generac | PSLC |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6—Indefinite.<br><br>**Function:** timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter<br>**Structure:** None. | Plain and ordinary meaning. Plaintiff's Alternative Proposed Function and Corresponding Structure to the Extent the Court Requires Section 112(6) Treatment of the Phrase:<br><br>Function: timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter<br><br>Structure: processor circuit, as set forth in '727, Col. 27, l. 61 through Col. 28, l. 29 et seq., and associated hardware for executing the identified claim language or similarly worded operations found in the specification, and equivalents thereto |

Like the "processor circuit" limitation in Claim 13, this means-plus-function limitation lacks the requisite disclosure of an algorithm for performing the claimed functionality, rendering Claim 37 indefinite under § 112 ¶ 6. As explained above, "processor circuit" is subject to § 112 ¶ 6 because it is defined so broadly and generically in the specification as to include any structure that involves processing data in control systems. *See Williamson*, 792 F.3d at 1349.

As with Claim 13, Plaintiff's alternate proposed structure fails to provide a definite algorithm for "programmed . . . to prevent exceeding the maximum current capacity of the DC to AC inverter." It cannot propose one because a definite "maximum current capacity of the DC to AC invertor" and the algorithm needed to prevent exceeding it are, as discussed above with Claim 13, not disclosed in the specification. Claim 37 is therefore also an indefinite means-plus-function claim. *See EON Corp*, 785 F.3d at 623.

11

### B. The '618 Patent's Terms

#### 1. *"small backup power system"*

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent Claims 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 | Plain & Ordinary Meaning; No Construction Necessary | "those used for an individual home or business with a single or multiple phase service connection of 440 volts or less and 400 amps or less" |

PSLC has not provided a reason for the Court to construe this term. It is readily understandable by a jury. "[D]istrict courts are not (***and should not be***) required to construe ***every*** limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd.*, 521 F.3d at 1362 (emphasis added); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy.").

#### 2. *"terminal"*

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent Claims 17, 21, 22, 23, 24, 25, 29 | Plain & Ordinary Meaning | "connections for electric circuits, usually those circuits are wires which are sometimes called leads" |

"Terminal" should be given its plain and ordinary meaning because it is a common term and nothing in the intrinsic record suggests its meaning should be anything else. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013) ("[W]e will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history."). Plaintiff's construction inserts unnecessary and vague language (like "usually") and does not help clarify the term's plain and ordinary meaning. Further, elements of PSLC's proposal are already addressed by the rest of the claim. Independent Claim 17 recites a "contactor having . . . line and load ***terminals for wiring the contactor in series***." '618 Pat. at Cl. 17. Without a genuine dispute identified by PSLC, construction is unnecessary.

### 3. *"via the connection or sensor coupled to the line connection"*

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent claim 1 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

The challenged phrase is indefinite, for a POSITA cannot determine which connection is "the connection" via which the processor is responsive. Part (a) of Claim 1 introduces three types of connections: "a control connection," "a line connection," and "a load connection." But the claim does not indicate which of these connections is "the connection." *See, e.g.*, Manual of Patent Examination Procedure (MPEP) § 2173.05(e)) ("[I]f two different levers are recited earlier in the claim, the recitation of "said lever" in the same or subsequent claim would be unclear where it is uncertain which of the two levers was intended."); *Sensor Electronic Technology, Inc. v. Bolb, Inc.*, 2019 WL 4645338, at *31 (N.D. Cal. 2019) (finding a claim indefinite when the claim disclosed two different materials and later recited "the material" because "it is ambiguous whether the claim term 'the material' refers to 'a first . . . material,' or 'a second . . . material,' or both.").

This phrase's ambiguity stands in stark contrast to other instances where the '618 Patent's claims discusses connections. In every other case, the claims specify what type of connection a given "connection" is. For example, Claims 9–11, 16, 30–31, and 40 contain "line" connections, Claim 40 has a "load" connection, Claim 17 a "service" connection, Claims 40 and 41 describe "backup power" connections, and Claims 48 and 52 contain "load control output" connections. No other claim refers to "the connection" without explicitly designating which connection is meant.

Because it is unclear which of the possible connections "the connection" refers to, Claim 1 is indefinite. *See, e.g.*, *Midwest Athletics and Sports Alliance LLC v. Xerox Corp.*, 2020 WL 7692767, *17 (W.D.N.Y. 2020) (finding the claim indefinite because it was ambiguous whether "module"—which had no antecedent basis—and "printing module" referred to the same thing).

13

#### 4. "the priority"

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent claims 6, 14, 20, 27 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

The term "the priority" is indefinite because (1) it lacks antecedent basis; (2) it is an arbitrary, subjective label; and (3) the specification does not otherwise disclose a concrete meaning that defines the term with "reasonable certainty." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

To begin, dependent claims 6, 14, 20, and 27 claim "the priority" without reference to "a priority," and thus lack proper antecedent basis. As discussed above, courts routinely find claims indefinite for lack of antecedent basis. *Supra* § V(B)(4); *see also Lites Out, LLC v. OutdoorLink, Inc.*, 2017 WL 4882613, at *18–19 (E.D. Tex. Oct. 30, 2017) (Mazzant, J.); *Dig. Retail Apps, Inc. v. H-E-B LP*, 2020 WL 376664, at *10 n.7 (W.D. Tex. Jan. 23, 2020). The Federal Circuit holds claims indefinite when "a term does not have proper antecedent basis" and the basis "is not otherwise present by implication" or "the meaning is not reasonably ascertainable." *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

There is no definition by implication here because "priority" is an arbitrary label that, as seen in the specification, lacks a definite meaning in the field. The '618 Patent uses the term "priority" as the installer's (or user's) subjective "importance of the load to be connected." '618 Pat., 10:6-11. Claim scope cannot depend solely on an unrestrained, subjective determination of a particular individual purported to be practicing the invention. *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)); *see also Interval Licensing*, 766 F.3d at 1373.

Further, the meaning of a higher or lower "priority" is undefined, and the specification does not give definite guidance for what about a load makes it more or less important. As the

14

specification acknowledges, there is no singular meaning for what constitutes "the priority" of a load. *See* '618 Pat., 26:16–17 (each load "has associated with it one *or more* priority parameter(s)") (emphasis added). For example, in one embodiment "the priority" can refer to the order that loads are disconnected. *See, e.g.*, *id.* at 57:25–31 ("[A]t this value one or more low priority loads can be disconnected, preferable in sequence according to their priority with the lowest priority loads being disconnected first."). Or it can be the order by which it is reconnected to power. *Id.* at 7:32–34 (loads have "a priority" according to which it is "desirable to connect some or all loads."). Or it might depend on whether an installer or user considers a load "essential." *Id.* at 6:40-47. Priority may alternatively indicate whether to "connect to additional power sources." *Id.* at 40:12–14.

How a load controller handles a "priority" label is also arbitrary and cannot be a basis for defining it. In some embodiments, "high priority" means a load is never disconnected. *Id.* at 60:25–32. But in other embodiments, "high priority" loads, if "relatively small," "may be connected when the genset is only slightly overloaded." *Id.* at 56:3–6. Perhaps "[l]ower priority loads may be disconnected to accommodate higher priority loads." *Id.* at 26:62–63. But in other embodiments "lower priority loads" are "disconnected faster than higher priority loads." *Id.* at 35:51–55. Or, in others, some "low priority load[s] may be prevented from being connected" at all. *Id.* at 35:42–46.

"Priority" is also not stagnant. It may be changed manually or automatically. *Id.* at 60:12–15. Priority may also be different during power loss events. 61:40–45. It may depend on both time of day and the type of connected load. *Id.* at 30:12–31:11. Indeed, the '618 Patent lists a variety of "[s]econdary factors" that an installer might consider for "priority," including:

> [T]he time of day and decreasing ambient temperature[,] . . . calendar data, load usage habits, one or more parameter of the load for the particular device e.g. maximum possible load, expected load for current conditions, projected changes in the load with time or conditions, starting and surge currents (e.g. the starting current of an electric motor), power factor of the load such as resistive, capacitive or inductive type loads, the probability that a load will need to be connected or

15

disconnected during the near and distant future, damage done by failing to connect a load or by disconnecting a load once connected. The short and long term ability of the power source to supply power in known or projected amounts, environmental factors such as ambient temperature, humidity, altitude, quantity of fuel available, fuel delivery rate, quality of fuel, cost of fuel, cost of supplying power.

*Id.* at 30:57–31:11.

Because each load can have multiple priorities, and the function for each priority designation is arbitrary and not defined, a POSITA would not be able to understand which priority is "the priority" used in the challenged claims. It is not reasonably discernable without an antecedent basis or a defined function for "the priority" in the claims. *DDR Holdings, LLC v. Hotels.com, L.P.,* 773 F.3d 1245, 1261 (Fed. Cir. 2014) ("For some facially subjective terms, the definiteness requirement is not satisfied by merely offering examples that satisfy the term within the specification."). Accordingly, the meaning of "the priority" in these claims is indefinite.

### 5. *"unavoidable electronic circuit propagation delay time duration"*

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent claim 7 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

The challenged phrase from Claim 7 is indefinite. One cannot ascertain what this term refers to. It does not appear in the specification. And the plain meanings of the words, considered as a combination, do not refer to any definite thing.

***First***, considering the words individually does not help. The specification does not teach that anything is "unavoidable"—that word does not appear anywhere. Similarly, nowhere in the claims or specification refers to "propagation." And the phrase "delay time" does not add certainty. The specification describes numerous kinds of "delays."[2] None of these relate to an "electronic

_____

[2] *See, e.g.*, '618 Patent at 8:9–14 (delay charging a battery until a lower price of electricity is available), 61:60–65 (same), 8:19–21 (delay operating a load during maintenance of a power

circuit propagation delay time duration of an overload." In fact, the specification uses "duration" to mean contradictory things. It may be the length of normal generator loading,[3] or the length of a generator overload,[4] the time before loads are shed,[5] or the time before a load is reconnected.[6]

**Second**, even if each individual word had a definite meaning known to POSITA, the entire term is still indefinite because together the words create ambiguity. The Federal Circuit has routinely found phrases to be indefinite despite individual words having accepted meanings. *See, e.g.*, *Mantissa Corp. v. First Fin. Corp.*, No. 2022-1963, 2024 WL 607717, at \*4 (Fed. Cir. Feb. 14, 2024) (holding "transaction partner" indefinite); *Infinity Computer Prod., Inc. v. Oki Data Americas, Inc.*, 987 F.3d 1053, 1062 (Fed. Cir. 2021) (holding "passive link" indefinite); *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020) (holding "magnetic fuzz" indefinite).

---

source), 16:58–63 (delay time between generator start and verification the generator is running), 17:14–19 (allowing a generator that is running to continue running without applying a load to cool down), 25:62–26:3 (delay still constituting "timely" providing readings), 30:41–48 (waiting to clean an oven until loads like the air conditioner are connected), 34:49–57 (time a disconnected air conditioning unit remains disconnected to avoid excessive compressor currents), 35:25–32 (delay time between disconnect and reconnect loads), 36:51–55 (same), 56:3–17 (same), 59:63–11 (same), 59:60–63 (same), 48:19–27 (time between grid power loss and transfer to a generator).

[3] *See, e.g.*, 3:50–64 ("With respect to internal combustion engine powered electrical generators the maximum power available and transferred to a load for a given size generator is generally dependent on [the] . . . duration of the load."), 8:28–37 ("More generally loads may be supplied with current at a first known amount . . . for a known period of time (which may be the time to achieve a particular event or a particular clock duration) . . . .").

[4] *See, e.g.*, Cls. 8 ("duration of the overload"), 24 (same).

[5] *See, e.g.*, 9:19–25 ("In that fashion the present invention can select loads to be connected to the generator . . . while at the same time monitoring the present and expected future load thus ensuring that the generator will not be overloaded instantly or during the duration of any particular connection."); 50:1–11 ("If the voltage falls outside of either acceptable limit for more than a predetermined time then the microprocessor circuit 37 may actuate relay 83, which in turn causes relay 34 to open thus disconnecting the load 18 from the transfer switch. The parameters for the high and low voltage limits as well as the aforementioned time duration are preferred to be programmable . . . .").

[6] *See, e.g.*, 59:60–62 ("Those disconnected loads are then reconnected after a time delay."), 59:63–60:11 ("[A]fter an overload [the load] will not be reconnected until after a time delay which is unrelated to the generator's ability to power that load at that later time.").

17

Here, the vagueness of the words prevents a reader from understanding the scope of the claim from this collection of words in the challenged term. For example, which "electronic circuit" is this referring to? What is being "propagated"? Is the "delay time" the same as the "duration"? What is "unavoidable": the "propagation" or "delay time" or "duration"? These questions are not definitely and unambiguously answered by the claim or the specification.

*Third*, the prosecution history fails to resolve the claim's ambiguity. As an initial matter, that an examiner allowed this claim is not dispositive. "Indeed, if a patent examiner's allowance of a claim were dispositive, courts could never invalidate any patent claim." *Cypress Lake Software*, 2019 WL 4935280, at *3.

This phrase was filed originally as "in response to the *time duration* of an overload." The examiner rejected this claim as unpatentable over a prior art reference (Feron), explaining that:

> [T]he claimed "in response to a time duration" being inherent in there are a limited alternative approaches to [Feron's] load shedding in that the time could be instantaneous in which the "time duration" is zero[,] . . . to react wherein said "time duration" is said micro level, otherwise an actual time duration is provided.

*See* Ex. A at 9, Non-Final Rejection at 8 (15 July 2020). Essentially, the examiner rejected this claim as obvious because the prior art shed loads "instantaneously" which is still not "absolute zero", or after a predetermined time ("an actual time duration").

The applicant responded by amending the language to limit the "time duration" to "a known and greater than an unavoidable electronic circuit propagation." Ex. B at 3. He did not point to any support in the specification. Ex. B at 25, Response to 07/15/2020 Office Action at 6 (12 Aug. 2020). He responded only:

> In rejecting claim 7 the Examiner points to a non absolute micro level zero (as compared to an absolute zero) time duration, making a distinction based on the time it takes the Feron circuit to react. Applicant has amended claim 7 to avoid this argument and points out that the Feron device operation is neither known or zero (even if there is a slight and unavoidable micro level delay from signal propogation [sic] through an electronic circuit) which as the Examiner points to.

18

*Id*. But there is no explanation for what "electronic circuit" is involved, what is "propagated" to cause a "delay," or how this is "known" (or what "knows" it). Simply put: the applicant inserted this language to evade the examiner's rejection over prior art, without attempting to link it to any definite "time duration" in the described embodiments. *See Infinity Computer*, 987 F.3d at 1059–60 ("Neither the claim language nor the specification indicated which measure the claims covered. The prosecution history did not answer the question.") (citations removed) (discussing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015)). The intrinsic record "leaves an ordinary skilled artisan without reasonable certainty what this refers to. *Id.* at 1060.

### 6. *"the drop in frequency representing a known amount of power being supplied by the second power source"*

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent Claim 23 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

The problem with this phrase is that usage of "the drop" is ambiguous. One cannot reasonably ascertain whether "drop" in this claim refers to the ***occurrence*** of "the drop"—i.e., the fact that the frequency has dropped—or whether it refers to the ***magnitude*** of "the drop"—i.e., the extent to which the frequency has dropped. The ordinary usage of "drop" has more than one meaning. One might say "look out for the drop," referring to the occurrence of one. Or, one could say "the drop is significant," referring to its magnitude. Because there is no definite way to choose between the two plausible meanings, the phrase does not have a "reasonably certain" construction. *Teva Pharms.*, 789 F.3d at 1341, 1344–45 (Fed. Cir. 2015).

The '618 patent describes both kinds of frequency "drops" used for load shedding. The first embodiment recognizes the ***occurrence*** of a drop. For example, when too much power is supplied by a backup source, power frequency drops below the 60 Hz standard US frequency. *See* '618 Pat., 6:28–52. Here, that it has dropped below a threshold could communicate that the rated

19

amount of power "known" to the load coupler was reached. *See id.* (describing prior art shedding loads "when the frequency of the AC power provided by the generator drops below 58 Hz.").

But the patent noted the problems of embodiments using a frequency drop threshold. *See id.* at 18:47–62 ("The use of AC power frequency detection for control of load shedding is problematic. If the frequency detection is too sensitive unneeded shedding may occur, or if it is not sensitive enough, slow or no load shedding may occur . . . . A one size fits all frequency threshold . . . may allow overheating or other damage."), 6:53–66 ("[I]f the frequency threshold for disconnecting the load is set at 58 Hz, inaccuracies in frequency detection may cause an overload to be falsely detected"). And so, the patent teaches a second embodiment: where the **magnitude** of the frequency drop can communicate the "amount" of power is being supplied. For example, the greater the frequency drop, the greater the "amount" of power being supplied. *See id.* at 57:20–34 ("If the genset goes into overload, for example 105% of its rated load [instead of 95%], the microprocessor can then operate to adjust the frequency . . . to a different amount, for example 59 Hz [instead of 59.5 Hz] . . . . This will let the individual load control circuits know that the genset is slightly overloaded."), 58:18–26 ("As an example, when the genset is lightly loaded a refrigerator motor starting might cause the frequency to only dip 0.1 Hz for 3 seconds and when the genset is near maximum load the same motor starting would cause a 0.3 Hz dip for 3 seconds.").

Claim language does not provide a definite way to distinguish whether the inventor meant that "the drop" here refers to the **occurrence** of a drop (like prior art he criticized) or the **magnitude** of a drop (his alleged improvement). The inventor should not receive the benefit of the doubt—he knew how to draft claims unambiguously directed to the magnitude of the drop rather than its occurrence. *See, e.g.*, *id.* at cl. 11 ("for lower than normal frequencies, a lower frequency will cause a load shed faster than a relatively higher frequency"); *see also Nautilus, Inc. v. Biosig Instrs., Inc.*,

20

572 U.S. 898, 910 (2014) ("The definiteness requirement" of patent law "mandates clarity" in "the scope of the invention with reasonable certainty"). As a result, the phrase is indefinite.

### 7. *"The load coupler device of claim 1 wherein the processor circuit causes a load shed in response to the amount of total load on the power source, the amount of total load being determined by an electronic circuit which is part of a control system of the power source"*

| Patent(s), Claim | Generac | PSLC |
| --- | --- | --- |
| '618 Patent claim 12 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

Claim 12 is indefinite because it claims both an apparatus and a method. Here, the claim is for a "load coupler device," but the claim requires behavior by a separate, unclaimed component: a "power source." The problem with this is that one cannot determine upon the sale or use of the claimed "load coupler device" whether it infringes. Instead, it must be installed by a user with a particular power source, and that power source must perform the step of determining the "amount of total load." The claim would not be infringed if something else determines the amount of total load for the load coupler device. Because Claim 12 attempts to claim both a thing (a load coupling device) and requires certain steps be performed that are not structurally limited by the thing (a separate power source determining the amount of total load), it is invalid. "A single claim that covers both an apparatus and a method of use of that apparatus is indefinite because it is unclear whether infringement . . . occurs when one creates a[n infringing] system, or whether infringement occurs when the user actually uses [the system in an infringing manner]." *UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (quoting *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)) (quotations removed).

Such claims are indefinite because it is unclear "when the mixed subject matter of the claim would be infringed." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008). For the claim to be definite, the claimed apparatus must be "clearly

21

limited to a[n apparatus] possessing the recited structure and capable of performing the recited functions." *UltimatePointer*, 816 F.3d at 826 (citation omitted and cleaned up). In this line of cases, courts have found some claims to be indefinite because they recite user action. *See, e.g.*, *IPXL Holdings*, 430 F.3d at 1384 ("the user uses the input means"); *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) ("said individual callers digitally enter data"). Courts have also found indefiniteness when a claim recites a function or step that appears in isolation but is not specifically tied to structure in the claim. *See Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011)) (a "data transmitting device" "transmitting" without a "transmitter section"). Claim 12 is indefinite under both tests.

*First*, infringement of Claim 12—an apparatus claim—requires user action. The claimed "load coupler device" is not capable of practicing Claim 12 on its own. When the claimed device "causes a load shed" it must be because specifically because some external "control system of the power source" has determined the total amount of load. That is, unless a user installs the device specifically with "an electronic circuit which is part of a control system of the power source" performing this specific function, it cannot infringe. This is like *Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*, 2019 WL 497902, at *5–*6, *33 (E.D. Tex. Feb. 7, 2019). The independent claim there was directed to a specific device: an "add-on base station." The dependent claim in question required that this base station "expands coverage of a cellular network." But it also specified "the add-on base station is owned and installed by an individual or entity" (rather than a "telephone service provider").  The court determined that there was nothing in the claimed device that required it to have already been installed. *Id.* at *33. Accordingly, the court construed the claim as indefinite. Similarly, here, Claim 1 of the '618 patent claims a device (the load coupler) and dependent Claim 12 requires that the device be installed with other components used a certain

way (where the "a control system of the power source … determine[s]" the "amount of total load").

This is unlike cases where the claimed device is merely "configured" to operate a specific way. *See, e.g.*, *RightQuestion, LLC v. Samsung Elecs. Co.*, 2022 WL 1154611, at *9–*10 (E.D. Tex. Apr. 18, 2022). For example, Claim 12 does not merely require the load coupler device to be configured to use a determination of total received power. Instead, Claim 12 affirmatively calls for a user to install the load coupler device with a power source having a "control system" comprising an "electronic circuit" capable of "determin[ing]" the "total load," which is then used by the load coupler device to cause a load shed. This is more than an apparatus with configuration; it is claiming its installation and use and is therefore indefinite.

***Second***, Claim 12 recites a function in isolation that is not specifically tied to the structure of the claimed apparatus. This is like *Rembrandt Data Techs.* 641 F.3d at 1331. There, the claim was directed to a "data transmitting device." *Id.* at 1339. The device comprised a first and second "buffer means" and an "encoding means." But the claim also required "***transmitting*** the trellis encoded frames." *Id.* (emphasis added) The court rejected the plaintiff's argument that this was merely a capability of a "transmitter section," which should be part of the claimed "data transmitting device." A "transmitter section" was not expressly part of the claimed apparatus. *Id.* Thus, the apparatus claim required a method, so the claim was indefinite. *Id.* Here, the claim requires "determining the total amount of load," but that is not a capability of the claimed "load coupler device." The claim requires that something else perform that method.

This is unlike the claim Federal Circuit held definite in *MasterMine Software, Inc. v. Microsoft Corp.* 874 F.3d 1307 (Fed. Cir. 2017). The patent there claimed "a reporting module" in a CRM application. *Id.* at 1315. The claimed "reporting module" "receives from the user a selection" and "generates" a database query. *Id.* The Federal Circuit determined the patent "merely

claim[s] that the system 'possess[es] the recited structure [which is] capable of performing the recited functions.'" *Id.* at 1315 (quoting *MEC*, 520 F.3d at 1375). Because the functional language "is specifically tied to [the claimed] structure: the reporting module installed within the CRM software application," it "does not appear in isolation" and so the claim was not indefinite. *Id.* at 1316. Here, however, the capability to "determine[]" the "amount of total load" is not tied to a structure claimed in the "load coupler device." Instead, it is tied to an "electronic circuit which is part of a control system of the power source" ***external*** to the "load coupler device of claim 1."

Claim 12 is like a claim for an automobile capable of being powered by gasoline, but wherein the gasoline is being provided by a Chevron gas station pump. Because the claimed apparatus requires the user perform a specific method by a specific physical device outside the claimed apparatus, the method is "in isolation," not "tied to a [claimed] structure" of the apparatus. *Id.* at 1316. Claim 12 is indefinite.

> **8. "The load coupler device of claim 1 wherein before the processor circuit would otherwise close the contactor to resupply power to the first load when the known time period elapses, in response to one or more of:  i) the voltage of the power provided to and sensed at the contactor line connection, ii) the frequency of the power provided to and sensed at the contactor line connection, iii) the total load on the power source, iv) or, via a current transformer, the total current being supplied by the power source, the processor first determines at least one of whether the power source is already overloaded or if connecting the first load will cause the power source to become overloaded, and if one of these conditions exists, the processor does not close the contactor thus preventing the first load from being connected to the power source"**

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent, Claim 16 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

Claim 16 contains the same kind of fatal flaw as Claim 12. Claim 16 is also directed to the "load coupler device of claim 1." In Claim 16, the load coupler is responsive to "the total power current being supplied by the power source." The problem is that the claim requires that this be

specifically provided by an external component that is not part of the claimed device: "via a current transformer" monitoring the total power supply. It is therefore also a hybrid claim that requires the user to install the device with another specific device performing a specific function for there to be infringement. There would be no infringement if the user used something else to supply the total current. Therefore, it is unclear whether the "load coupler device" is infringed when it is made or sold, or whether it only infringes when used and installed a certain way.

Claim 16 does not recite that the "current transformer" monitoring the "the total current being supplied by the power source" is part of the claimed "load coupler device." It would not make sense, anyway. The specification confirms this. For example, Figure 4 depicts an installation in which a current transformer as an independent structure "23a" for monitoring the total output to *all* the loads. '618 Pat., 25:3–8 ("[L]oad monitor 23a [which] may simply be a current sense . . . transformer.") Here, the current transformer 23a can monitor the total current supplied to all the loads 16–20. The "load coupler device," however, is depicted in connection with Figures 13 and 14 connecting the power supply from the transfer switch to a single load. *Id.* at Figs. 13–15, 46:14–58:50. Although the "load coupler device" may contain a "current sense" component (e.g., 23b or 23c), it is depicted monitoring only the single load and not the total supply from the power source. Nothing in the claim requires the "load coupler device" in the independent Claim 1 be connected to all the loads, such that it can perform the claimed function "via current transformer." To the contrary, although the "power source" in Claim 16 is "powering a *group* of loads," the separate "load coupler device" is claimed with only a connection for "supplying power to a *first* load." There is no recited connection for the "load coupler device" to the entire "*group* of loads."

Thus, like the claim found indefinite in *Rembrandt*, the structure necessary to perform the claimed function is not recited as part of the apparatus. 641 F. 3d at 1330–40 ("transmitting" is

indefinite without a "transmitter section" in the claimed "device"). The Court "may not redraft" the claim to fix this problem and sustain its validity. *Id.* (quotation omitted) Because the claimed function in question appears in isolation and is not tied to a structure of the claimed device, it does not "inform those skilled in the art about the scope of the invention with reasonable certainty" and should be found indefinite. *See MasterMine Software, Inc.*, 874 F.3d at 15–16.

### 9. "*responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection*"

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '618 Patent, Claim 1 | Indefinite | Plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

Claim 1 is also indefinite because it is vague. It says the processor circuit is responsive to two things to "to cause a load shed": "the amount of total load" and "voltage, current or frequency." '618 Pat. at Cl. 1. But the patent describes numerous alternative ways to determine to "cause a load shed," including: (1) considering both these things together or (2) capable of considering either thing independently, but making a determination to shed a load based on just one thing. These multiple interpretations are mutually exclusive, yet the grammar of the phrase leaves unclear to a POSITA which of them it refers to. Because the phrase prevents a POSITA from knowing which of the arrangements above are intended to be covered by the claim, it fails to inform "the scope of the invention with reasonable certainty" and is therefore indefinite. *Nautilus*, 578 U.S. at 910; *Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, 681 F. App'x 898, 903 (Fed. Cir. 2017) ("The 'in response to' claim term does not apprise the public of what is still open to them" because it leaves "a zone of uncertainty.") (citation modified).

First, the specification does not indicate which of the mutually exclusive interpretations of "and" is claimed. At times, the specification describes causing a load shed when only one

parameter independently meets a specific condition, even though both may be considered. *See* '618 Pat. at 27:15–28 (Load control 25a may "be caused to operate **only when one or more** parameter of the system changes appreciably" like "if grid power experiences problems such a fluctuations in voltage **or** frequency.") (emphasis added), 56:42-67 ("[I]t may be utilized to control **one or more** parameter . . . [for example] the power frequency, **and/or** the . . . voltage.") (emphasis added), 53:58-54:57 ("The load control circuit 25c, senses **one or more** parameter of the power, in this example the A.C. power frequency via connection 87 **as well as** the current drawn by the load via a current sense 23 d and controls the  . In this embodiment the load control circuit 25 c will operate to sense the power frequency (**and/or** voltage or other parameter).").

In other embodiments, both parameters—the "total load" and the "voltage, current or frequency"—are considered together, not independently. For example, the patent describes an embodiment where the device control loads by "infer[ring]" the total load by measuring parameters such as frequency and/or voltage variations. *Id.* at 58:5-42 ("[B]y utilizing the aforementioned circuitry to perform current and voltage measurements **combined with** either a known connection of a load such as an air conditioner compressor or the somewhat random changes of normal operation **it will be possible to estimate the total load on the genset**") (emphasis added); *see also* 53:66-54:2 ("Load control 25 c **may also** sense the voltage, distortion **or other parameter** of the power via 87 **and incorporate those measurements into the control**.") (emphasis added).

Because the grammar of the claim is ambiguous, and the specification provides no context for a POSITA to be reasonably certain which disclosed embodiment the inventor intended to claim, Claim 1 is indefinite. *Interval Licensing*, 766 F.3d at 1371 ("[T]here is an indefiniteness problem if the claim language might mean several different things and no informed and confident choice is available among the contending definitions.") (quoting *Nautilus*, 134 S.Ct. at 2130 & n.8)

27

(quotations removed).

### C. The '857 Patent's Terms

#### 1. *"sine wave distortion" / "sine distortion"*

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '857 Patent, Claims 66, 71 | Plain & Ordinary Meaning, which is "deviation from an ideal sine wave" | Plaintiff contends that those terms shall carry their plain and ordinary meaning as read in light of the intrinsic record by one having ordinary skill in the art. |

The parties dispute whether "sine wave distortion" and "sine distortion" refer to distorting a sine wave to be less than an ideal sine wave (as Generac proposes) or whether an adjustment in a sine wave's periodic frequency is a claimed "distortion" (as PSLC suggests). The former must be correct, for (1) distortion's ordinary usage refers to deviations from an ideal, (2) the claims recite sine wave distortion as a parameter distinct from a sine wave's frequency, and (3) the specification corroborates this distinction and supplies examples where frequency would change but distortion would not. As such, "distortion" should be given its plain and ordinary meaning, which here means a "deviation from an ideal sine wave." Because the parties dispute what the ordinary meaning is, the Court must resolve the dispute. *O2 Micro Int'l, Ltd.*, 521 F.3d at 1361.

***First***, because "distortion" is a commonly understood term even to a layperson, it should be construed according to its plain meaning as "deviation from an ideal." Where, as here, claim language uses ordinary words, the "ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. "[C]laim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* That is the case here. A sine wave is a periodic wave that follows the trigonomic sine function. Its period—the time between peaks—has a frequency, such as the "standard 60 Hertz" for alternating current in North America. '618 Pat., 6:28–52. The term

"distortion" is used in its ordinary sense: as a deviation from the ideal. A distorted sine wave is simply one that departs from the ideal sinusoidal waveform; the greater the distortion, the less the waveform resembles a pure sine wave at any given periodic frequency:



**Second**, as seen above, a sine wave would be a sine wave regardless of what its periodic frequency is. Changing its periodic frequency (e.g., 58 Hz instead of 60 Hz) just moves the peaks of the wave closer or further in time from each other. As a result "sine wave distortion" cannot refer to changing periodic frequency of the sine wave (as PSLC proposes) without rendering the claimed use of "frequency" in the patent superfluous. They must refer to different things. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324 (Fed. Cir. 2011) (quoting *Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)). "To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." Id. (quoting the same).

In every instance that "distortion" arises in the claims, sine wave has a "frequency" distinct from "distortion." For example, Claim 24 (depending from Claim 21) recites a "coupling circuit" that is "***additionally*** responsive to the AC power sine wave distortion." (emphasis added). Because Claim 21 already requires that "the coupling being responsive to the frequency of the output AC

power," Claim 24 would not be "additionally responsive" to anything if sine wave distortion referred to the "frequency of the output AC power." Moreover, both Claims 66 and 71 recite "frequency" and "distortion" as distinct things in the same list of parameters. The same is true with the description of "distortion" in the specification. In the only reference to "sine wave distortion," a "lightly loaded" power source's frequency changes, but not its distortion. '857 Patent at 58:11–26. When "lightly loaded," this "might cause the **frequency** to only dip 0.1" whereas "**sine wave distortion** of the power might not increase at all if lightly loaded." *Id.* (emphasis added). These must be different parameters.

*Finally*, the claims and specification does not make any distinction between "sine wave distortion" and "sine distortion," The term "the sine distortion" only appears Claim 71, which depends from Claim 66. The only antecedent basis for "the sine distortion" in Claim 71 is "sine wave distortion" in Claim 66, so these terms must refer to the same thing.

### D. Common Terms

#### 1. "power grid"

| Patent(s), Claim | Generac | PSLC |
|---|---|---|
| '857 Patent, Claims 7, 10, 13<br><br>'727 Patent, Claims 13, 27 | Plain & Ordinary Meaning; No Construction Necessary | "any commonly known and used sources of electrical power to homes and businesses, e.g. public and private electric utility companies" |

PSLC has not provided a reason to construe this term. The specification expressly says that this term "is used herein in its common and ordinary meaning." '727 Pat., 15:21-24. It is readily understandable by a jury. "[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd.*, 521 F.3d at 1362 (emphasis added).

## VI. CONCLUSION

Generac respectfully requests that the Court adopt its proposed constructions.

30

Dated: January 23, 2026     FISH & RICHARDSON P.C.

By: */s/ David B. Conrad*
Neil J. McNabnay
njm@fr.com
David B. Conrad
conrad@fr.com
Michael R. Ellis
ellis@fr.com
Brandon S. Avers
avers@fr.com

FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)

***Attorneys for Defendant***
***Generac Power Systems, Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing

document has been served via electronic mail on January 23, 2026, to all counsel of record who

are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ David B. Conrad*
David B. Conrad