UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | | |
|---|---|---|
| PSLC LLC, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 2:24-cv-1270-PP |
| | § | |
| v. | § | |
| | § | |
| GENERAC POWER SYSTEMS, INC. | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

TABLE OF AUTHORITIES ................................................................................................ iv

I.     INTRODUCTION .......................................................................................................1

II.    LEGAL STANDARD.................................................................................................1

III.   ARGUMENT ..............................................................................................................4

A.    Undisputed Terms Where Patentee Acted as his Own Lexicographer ("overload", "parameter", "timely", "know" / "known")............................................................4

B.    Remaining Lexicographer Terms ..........................................................................5

    1.    "small backup power system"...................................................................5

    2.    "power grid".................................................................................................7

    3.    "terminal".....................................................................................................7

C.    No Term Should be Construed as Means-Plus-Function......................................8

    1.    Lack of "means" Language in the Claims Creates a Presumption Against the Application of Section 112(6)..............................................................8

    2.    The Presumption Against 112(6) Application Cannot Be Overcome Because the Claims as Written Provide Sufficient Structure.......................................9

         a.  Plaintiff's Alternative Proposal to the Extent the Court Requires Section 112(6) Treatment of the Phrase "the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch" ...............................................................................14

         b.  Plaintiff's Alternative Proposal to the Extent the Court Requires Section 112(6) Treatment of the Phrase "the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter".................16

D.    All Remaining Terms Should Be Afforded Their Plain and Ordinary Meaning and Defendant's Request for a Finding of Indefiniteness Should Be Denied ..........................17

1. "via the connection or sensor coupled to the line connection" ...................................... 18

2. "the priority" ...................................................................................................... 20

3. "unavoidable electronic circuit propagation delay time duration" ........................ 21

4. "The load coupler device of claim 1 wherein the processor circuit causes a load shed in response to the amount of total load on the power source, the amount of total load being determined by an electronic circuit which is part of a control system of the power source" .......................................................................................... 23

5. "the drop in frequency representing a known amount of power being supplied by the second power source" ...................................................................................... 25

6. "The load coupler device of claim 1 wherein before the processor circuit would otherwise close the contactor to resupply power to the first load when the known time period elapses, in response to one or more of: i) the voltage of the power provided to and sensed at the contactor line connection, ii) the frequency of the power provided to an sensed at the contactor line connection, iii) the total load on the power source, iv) or, via a current transformer, the total current being supplied by the power source, the processor first determines at least one of whether the power source is already overloaded or if connecting the first load will cause the power source to become overloaded, and if one of these conditions exists, the processor does not close the contactor thus preventing the first load from being connected to the power source" ...................................................................... 26

7. "responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection" ........................................................................................................... 27

8. "sine wave distortion"` ............................................................................................ 28

9. "sine distortion" ...................................................................................................... 29

IV. CONCLUSION .................................................................................................................. 30

CERTIFICATE OF SERVICE ........................................................................................................ 31

# TABLE OF AUTHORITIES

***Cases***:

*Ameritox, Ltd. v. Millennium Health, LLC*,
   88 F.Supp.3d 885 (W.D. Wis. 2015) ...............................................................21

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007)........................................................................3

*Apex Inc. v. Raritan Comput., Inc.*,
   325 F.3d 1364 (Fed. Cir. 2003).......................................................................10

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014)....................................................................9, 12

*Austin Hardware & Supply, Inc. v. Allegis Corp.*,
   2020 U.S. Dist. LEXIS 178588 (E.D. Wis. Sep. 29, 2020)............................15

*Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*,
   2019 U.S. Dist. LEXIS 20394 (E.D. Tex. Feb. 7, 2019) ................................24

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs.*,
   301 F. Supp. 2d 914 (W.D. Wis. 2003) ..........................................................12

*Chimie v. PPG Industries, Inc.*,
   402 F.3d 1371 (Fed. Cir. 2005).......................................................................29

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) ...............................................................9, 10, 11

*HTC Corp. v. IPCom GmbH & Co.*,
   667 F.3d 1270 (Fed. Cir. 2012).......................................................................24

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986).......................................................................22

*Innovaport LLC v. IKEA N. Am. Servs. LLC*,
   2024 U.S. Dist. LEXIS 29266 (E.D. Wis. Feb. 21, 2024) ................................2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
   381 F.3d 1111 (Fed. Cir. 2004).......................................................................21

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
   2011 U.S. Dist. LEXIS 7784 (E.D. Wis. Jan. 19, 2011)................................29

*M2M Sols. LLC v. Sierra Wireless Am., Inc.,*
    2015 U.S. Dist. LEXIS 134558 (D. Del. Oct. 2, 2015) ....................................12

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996) ..................................3

*Mastermine Software, Inc. v. Microsoft Corp.,*
    874 F.3d 1307 (Fed. Cir. 2017)...........................................................................24

*Metso Minerals Indus. v. Johnson Crushers Int'l, Inc.,*
    866 F. Supp. 2d 1024 (E.D. Wis. 2011)................................................................9

*Midwest Athletics and Sports Alliance LLC v. Xerox Corp.,*
    2020 U.S. Dist. LEXIS 242830 (W.D.N.Y. Dec. 28, 2020).............................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    572 U.S. 898 (2014)........................................................................................18

*O2 Micro Int'l. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)..........................................................................2

*Orion Energy Sys. v. Energy Bank Inc.,*
    2017 U.S. Dist. LEXIS 174665 (E.D. Wis. Oct. 23, 2017) ...........................................2

*Phillips v. AWH Corporation,*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .............................................1, 2, 3

*Praxair, Inc. v. ATMI, Inc.,*
    543 F.3d 1306 (Fed. Cir. 2008)..........................................................................18

*Sage Prods. v. Devon Indus.,*
    126 F.3d 1420 (Fed. Cir. 1997)..........................................................................12

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.,*
    802 F.3d 1283 (Fed. Cir. 2015)..........................................................................2

*Thorner v. Sony Computer Ent. America LLC,*
    669 F.3d 1362 (Fed. Cir. 2012)..........................................................................2

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)............................................................................3

*Wash World, Inc. v. Belanger, Inc.,*
    2021 U.S. Dist. LEXIS 45258 (E.D. Wis. Mar. 9, 2021) ...........................................18, 19

## I. INTRODUCTION

At this juncture, the parties' positions stand in stark contrast to one another and diverge in a straightforward manner.

Plaintiff has applied the *Phillips* framework, giving effect to the patentee's express definitions where they appear in the intrinsic record and affording the remaining terms their plain and ordinary meaning.

Defendant, on the other hand, adopts only the patentee's lexicography that suits its purposes and disputes the rest. The remainder of Defendant's Opening Brief falls into three categories of argument: 1) attempting to classify two terms under means-plus-function treatment, despite the undisputable presence of a presumption against doing so that cannot be overcome in light of the plainly sufficient structures set forth in the claims as written and throughout the extensive specification; 2) labelling seven terms indefinite, relying solely on attorney argument that is in direct contrast to the only testimony in the record of one imminently qualified and skilled in the art, presumably lying in wait to provide its own competing supporting testimony for the first time in its forthcoming Reply Brief; and 3) asking the Court to construe the remaining two terms in a way that would read out preferred embodiments, as expressly and repeatedly cautioned against by the Federal Circuit. All three of Defendant's arguments lack support in both the governing law and the evidentiary record.

Having failed to invalidate the patents through its Section 101 Motion to Dismiss last August, and after having all three of its serial *inter partes review* petitions denied outright by the USPTO Director last week before even reaching the institution stage, Defendant now turns to claim construction as its latest vehicle for the same failed objective. Defendant's positions reflect litigation strategy rather than a faithful application of the claim construction principles, and as such, should be rejected in their entirety.

## II. LEGAL STANDARD

The basic framework for claim construction is well established. In its decision in *Phillips*, the Federal Circuit reaffirmed the longstanding principle that "the claims of a patent define the

invention to which the patentee is entitled the right to exclude" and the words used in a claim are generally given their plain and ordinary meaning. *Phillips v. AWH Corporation,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). The plain and ordinary meaning of a claim term is the meaning the term would have to a person of ordinary skill in the art at the time of the invention and in the context of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-1313.

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). If neither exception applies, courts are instructed not to engage in needless construction, rewriting, or redefining words. As the Federal Circuit has continually recognized, a district court does not err by declining to construe a claim term in favor of maintaining its plain and ordinary meaning. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015). Instead, the starting point of the claim construction process is also the ending point, and the court should hold that the term at issue simply carries its plain and ordinary meaning. *Thorner*, at 1366 ("[W]e do not redefine words. Only the patentee can do that."); *see also*, *O2 Micro Intl Ltd. v. Beyond Innovation Tech Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("[A] district court is not obligated to construe terms with ordinary meanings, lest trial court be inundated with requests to parse the meaning of every word in the asserted claims.").

Courts in this District have routinely upheld the practice of declining construction for terms in favor of holding that the "plain and ordinary" meaning should remain in place. *See, e.g.*, *Orion Energy Sys. v. Energy Bank Inc.*, 2017 U.S. Dist. LEXIS 174665 (E.D. Wis. Oct. 23, 2017) (declining defendant's attempts to define fifteen claim terms and instead, recognizing no exception to the general rule present, holding those fifteen claim terms as "plain and ordinary" with no further construction necessary); *see also Innovaport LLC v. IKEA N. Am. Servs. LLC*, 2024 U.S. Dist. LEXIS 29266, at *15-16 (E.D. Wis. Feb. 21, 2024):

Accordingly, rewording the language used in pursuit of clarity in claim construction would serve no purpose (other than potentially introducing new and unintended issues to the dispute). The Court will rely on the terms [the patentee] used in drafting the patents themselves. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (adopting the plain and ordinary meaning of claim terms without further construction).

When considering the meaning of words in a claim, a court first looks to the intrinsic evidence of record, i.e., the claims, the specification, and the prosecution history. *Phillips*, 415 F.3d. at 1312-17. A patent's specification "is the single best guide to the meaning of the disputed term." *Id.* at 1315; '727 Patent Col. 1, l. 61 *et seq*. But while the claims must be read in the context of the specification, courts must not read limitations from the specification into the claims "absent a clear disclaimer of claim scope." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007). The last piece of intrinsic evidence, the prosecution history, is another tool to contextually view the language of the claims.

In addition to considering the intrinsic record, a court may resort to extrinsic evidence, such as expert and inventor testimony, to confirm a construction is consistent with the intrinsic evidence. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 987 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996); *see also Phillips*, 415 F.3d at 1317. However, reliance on extrinsic evidence is improper where the intrinsic record unambiguously describes the scope of the patent. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). As discussed further below, Defendant's Opening Brief does not cite to or rely upon ***any*** testimony of one skilled in the art. By contrast, Plaintiff is submitting herewith the expert Declaration of Dr. Regan Zane, not in an attempt to rewrite or displace the intrinsic record, but to confirm that the intrinsic record aligns with how a person of ordinary skill in the art would understand the terms. Courts routinely rely on such testimony to illuminate, not alter, the meaning already reflected in the patent. This is particularly noteworthy given that Defendant has the burden, by clear and convincing evidence no less, to establish indefiniteness of any term.

Finally, for ease of reference, the applicable law surrounding 35 U.S.C. § 112 means-plus-function treatment, as well as indefiniteness, will be addressed in conjunction with their respective claim terms below.

## III.    ARGUMENT

### A.    Undisputed Terms Where Patentee Acted as His Own Lexicographer: ("overload",  "parameter", "timely", "know" / "known")

The inventor of the Patents-in-Suit, Mr. Carl Cooper, is a registered patent agent and prosecuted these patents before the United States Patent Office himself.[1]  In keeping with the law set forth above, Plaintiff has endeavored to identify each instance where Mr. Cooper acted as his own lexicographer.  For each of those instances (a total of seven terms), Plaintiff has proposed a construction coinciding with Mr. Cooper's explicit definition.  Defendant agrees to the following constructions of four of the seven lexicographer terms:

- "overload" as "a load that if not disconnected or otherwise prevented will either cause a departure from specifications for the power output from the power source, for example such as a deviation of AC power voltage or frequency for longer than a specified time period, a loss of power such as from a tripped circuit breaker, or damage such as overheating or exceeding mechanical stress limits."  *See* '857 Patent at Col. 7, ll. 55-62.

- "parameter" as "a quantity of one or more property or attribute (e.g. of a device, physical property, substance or environment) which is treated as constant."  *See* '857 Patent at Col. 10, ll. 11-23.

- "timely" as "instant, real time, close to real time or a suitable time."  *See* '857 Patent at Col. 25, ll. 60-66; *see also* '727 Patent file history, Appeal Brief at p. 62.

---

[1] Plaintiff submits this Brief in support of its claim construction positions for the claim terms and/or phrases found within the three related asserted patents: U.S. Patent Nos. 11,967,857 ("the '857 Patent"), 10,879,727 ("the '727 Patent"), and 10,892,618 ("the '618 Patent"), collectively ("Patents-in-Suit" or "Asserted Patents").  A copy of the Patents-in-Suit are attached to the Declaration of Dave R. Gunter ("Gunter Decl.") submitted concurrently herewith.

- "know" or "known" as "to have been previously stored in a memory and available e.g. having been previously manufactured with, programmed with or measured." *See* '857 Patent at Col. 26, ll. 16-25; *see also* '727 Patent file history, Appeal Brief at p. 61.

Plaintiff respectfully requests the Court adopt the parties' agreed constructions for the above undisputed terms.

## B. Remaining Lexicographer Terms

Once the Court applies the lexicographer principles that both parties accepted with regards to the four terms above, the analysis of the next three terms follows naturally. For the next three terms, the intrinsic record again reflects the patentee's clear definitional intent, and Plaintiff's proposed constructions respect and reflect the inventor's definitions. Defendant's attempt to change interpretative frameworks mid-stream, now ignoring the patentee's lexicography in place of "plain and ordinary", should be rejected.

### 1. "small backup power system"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| "those used for an individual home or business with a single or multiple phase service connection of 440 volts or less and 400 amps or less" | Plain & Ordinary Meaning; No Construction Necessary |

Defendant's proposal on "small backup power system" is even more conspicuous in that, up until the filing of its Opening Brief, Defendant alleged that this term should be construed as "backup power system used for an individual home or business with a single or multiple phase service connection of 440 volts or less and 400 amps or less." *See* Dkt. No. 40-1. While its prior proposal was closer to Plaintiff's proposal here, it did not track the express language used by the patentee and was therefore improper. Defendant offers no explanation as to its altered "plain and ordinary" position. Instead, Defendant merely states "PSLC has not provided a reason for the

5

Court to construe this term." But the "reason" is the same rationale applied and agreed to above, namely acknowledging the patentee's choice to act as his own lexicographer.

Plaintiff's proposed construction comes word-for-word from the specification (*see* '857 Patent at Col. 19, ll. 20-25). Further driving home the point, the patentee also included his definition during the prosecution of the patents in a section titled "Claim Interpretation: Applicant as His Own Lexicographer":

> **Claim Interpretation: Applicant as His Own Lexicographer**
>
> Throughout the specification, applicant, as his own lexicographer, has defined various terms and phrases. Some examples of these definitions are set out below, with several being used in the claims.

Dkt. No. 9-1, '727 Patent file history, Appeal Brief at p. 62. It stretches the bounds of credulity for Defendant to argue against an application of the patentee's lexicography now.

The patentee's express definitional language also aligns with the understanding of one having ordinary skill in the art. Submitted concurrently herewith is the Declaration of Dr. Regan Zane ("Zane Decl."). Dr. Zane's qualifications firmly cement him as meeting and exceeding one skilled in the art. *See* Zane Decl. at ¶¶ 3-15, and Ex. A thereto. And as Dr. Zane recognizes, the patentee deliberately used "small backup power system" to capture the specific applications described in the specification. Dr. Zane confirms that the disclosures within the intrinsic record convey to him as one skilled in the art that the patents are directed towards solutions for small backup power systems as opposed to larger systems, i.e., a utility grid. Zane Decl. at ¶¶ 36-39.

Against this backdrop, the actual reason for Defendant's shift to "plain and ordinary" is clear. The patentee's definition would exclude much of the prior art Defendant seeks to assert,

namely art that falls well outside the field of invention.  Defendant's attempt to construe (or in this case ***not*** construe) the claims according to litigation-driven considerations should be rejected.

### 2. "power grid"

| Plaintiff's Proposal | Defendant's Proposal |
| --- | --- |
| "any commonly known and used sources of electrical power to homes and businesses, e.g. public and private electric utility companies" | Plain & Ordinary Meaning; No Construction Necessary |

Defendant continues the same error with the term "power grid."  Defendant's cited specification quote  conveniently omits the remainder of the sentence: "Power grid is used herein in its common and ordinary meaning ***and refers to any commonly known and used sources of electrical power to homes and businesses, e.g. public and private electric utility companies.***" '857 Patent at Col. 15, ll. 24-38.  Plaintiff need not set forward any further "reason" to construe the term separate from the fact that the patentee was acting as his own lexicographer and his definition should apply.  Defendant's attempt to blur the confines of the prior art under the guise of "plain and ordinary" here should be rejected.  Zane Decl. at ¶¶ 32-33.

### 3. "terminal"

| Plaintiff's Proposal | Defendant's Proposal |
| --- | --- |
| "connections for electric circuits" | Plain & Ordinary Meaning; No Construction Necessary |

The word "terminal" presents the final instance where the patentee acted as his own lexicographer.  Particularly, in the context of the '618 Patent file history and as part of a Response to an Office Action, the patentee clarified the meaning of "terminals" (Dkt. No. 41-2, Response to 07/15/2020 Office Action at p. 4):

7

> It does not appear to be at issue here, but for clarity and ensuring that the Examiner, Applicant and others reading this response have the same understanding, is noted in passing that as used in the specification and claims, and as well-known in the art, terminals are connections for electric circuits, usually those circuits are wires which are sometimes called leads. In particular terminals are frequently not shown on wiring

In other words, the use of the word "terminal" refers to connections for electric circuits. These include, but are not limited to, the various types of terminals which are particularly useful for electrical wires. *See, e.g.*, '857 Patent at Col. 51, ll. 47-51. Zane Decl. at ¶¶ 42-43.

Defendant's arguments are misplaced. First, Defendant misstates Plaintiff's proposed construction which does not include the "usually" language that Defendant takes issue with in its Opening Brief. *See* Joint Claim Construction and Prehearing Statement, Dkt. No. 40-1 (Plaintiff's proposed construction for is "connections for electric circuits."). Second, Defendant's assertion that the construction is "unnecessary and vague" is at best unsupported attorney argument standing in direct contrast to the only record testimony of one skilled in the art. Zane Decl. at ¶ 43.

## C.   No Term Should be Construed as Means-Plus-Function

Moving past the patentee's lexicographer terms, Defendant has proposed two phrases, both involving a claimed "processor circuit" term, as being governed by 35 U.S.C. § 112(6). In doing so, Defendant asks the Court to apply means-plus-function treatment to the terms and thereafter find the claims indefinite. Defendant's request should be rejected for numerous reasons.

### 1.   Lack of "means" Language in the Claims Creates a Presumption Against the Application of Section 112(6)

Defendant is eager to gloss over the threshold issue faced by a court when asked to construe a claim term as means-plus-function. That is because, at the very outset, Defendant cannot deny the "legal presumption" ***against*** means-plus-function treatment for the claimed "processor

circuit." *Metso Minerals Indus. v. Johnson Crushers Int'l, Inc.*, 866 F. Supp. 2d 1024, 1037 (E.D. Wis. 2011). "[W]here the claim language does not contain the word 'means,' the court presumes that the language is not in means-plus-function form." The presumption can only be overcome if the challenger demonstrates that the claim language fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function." *Id*.

Here, neither Claims 13 or 37 of the '727 Patent use the words "means" or "a means for." Nor do the claims recite "a processing means for" or "a processing circuit means for." As a registered patent agent, Mr. Cooper is keenly aware of the way a patentee may claim means-plus-function scope within his patent and chose not to do so here. In fact, Mr. Cooper has previously included language to that effect in others of his patent applications. *See, e.g.*, U.S. Patent Nos. 12, 040,612, 11,183,843, and 11,764,579 ("To aid the Patent Office and readers the patent(s) issued based on this application in interpreting the claims appended hereto, applicant wishes to note that he does not intend any of the appended claims or claim elements to invoke 35 U.S.C. 112(f) unless the words "means for" or "step for" are explicitly used in the particular claim.").

## 2. The Presumption Against 112(6) Application Cannot Be Overcome Because the Claims as Written Provide Sufficient Structure

Given the presumption, Defendant goes from an uphill battle to an insurmountable one because "processor circuit", particularly when read in light of the claim as a whole and the intrinsic record, provides sufficient structure. The Federal Circuit has continuously noted that the limitation need not connote a single, specific structure, but may instead describe a class of structures. In the recent *Dyfan* holding, the Federal Circuit revisited and reaffirmed its earlier decision in *Apple* on this very point. *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022). "In *Apple*, we explained that structure can be recited in various ways, including through the use of 'a claim term

with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Id*. *Dyfan* went on to review and rely upon its earlier holding in *Apex*, where the Federal Circuit addressed a series of "circuit" limitations:

> In cases where it is clear that a claim term itself connotes some structure to a person of ordinary skill in the art, 'the presumption that § 112, ¶ 6 does not apply is determinative' in the absence of 'more compelling evidence of the understanding of one of ordinary skill in the art.' *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003). For example, in *Apex*, the disputed claim limitations included a set of 'circuit' limitations. *Id*. at 1369. Raritan relied on district court decisions addressing the definition of 'circuit means'; expert testimony that the term 'circuit' would have been 'understood by one of ordinary skill in the art as a very broad term'; and the description of preferred embodiments in the specification that 'circuit' did not connote definite structure to a person of ordinary skill. *Id*. at 373-74. We disagreed, however, and found that 'this evidence [was] not sufficient to rebut the § 112, ¶ 6 presumption' because it 'fail[ed] to show by a preponderance of the evidence that one of ordinary skill in the art believes the term does not recite sufficiently definite structure.' Relying on dictionary definition that defined 'circuit' as a 'combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function,' we determined that 'circuit,' by itself connotes some structure.

The above discussion is instructive to the facts here. The claimed "processor circuit" is a well understood structural term to one having skill in the art. Zane Decl. at ¶¶ 45-56. "Processor" is a standard structural term referring to hardware that executes instructions or performs computations, and "circuit" denotes a classic structural term referring to the physical arrangement of electronic components. *Id*. The use of the term "processor circuit" refers to a well understood class of known structures configured to perform processing operations. *Id*. Dr. Zane's testimony is solidified by the disclosures made in the specification. There, the claimed processor circuit is disclosed by recitation to known structures ('727 Patent at Col. 27, l. 61 through Col. 28, l. 29):

> The processor circuit will include a processor, e.g. a digital machine performing logic, computing and/or program execution operations which machine accepts data and runs (i.e. executes) logic operations, computing operations and/or program steps to produce results. The processor circuit will also include supporting circuitry

to facilitate the processor accepting data, executing one or more logic operations, computing operations and/or program(s), produce and utilize the necessary results and communicate with other components and devices. The processor circuit and its various elements may be of any of the types suitable for performing the various desired ones of control, monitoring, storage, communications, calculation and decision making operations described herein which are necessary to implement a particular version of the invention. The processor circuit may be implemented with any type(s) of circuit devices currently known or which will become to be known in the electronic control systems art including but not limited to analog and digital circuits, LSI, VLSI, ASIC, PLD, CPLD, FPGA, DSP, IP Core, Array, microcontroller, microprocessor, Multicomputer, RISC or CPU integrated circuits.

The specification also describes how the processor circuit may comprise multiple circuits located in multiple locations. *See id*. at Col. 29, ll. 15-29.

Furthermore, the claims themselves go into great detail as to the capabilities of the "processor circuit" in exactly the manner allowed under *Dyfan*. The claims do not read "a means for processing" or the like and leave it there. Instead, the claims recite not only a known structure but the specific requirements of said structure. The surrounding claim language describes how the "processor circuit" interacts with other components, receives inputs, produces outputs, and how it is a part of a larger architecture. That context further confirms that the term refers to concrete hardware components and not a black-box function as Defendant would have the Court believe. Claim 13 states in the totality of limitation (c):

> c) the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch.

And the totality of Claim 37 in limitation (c) states:

> c) the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter.

The claims' recitation of sufficiently definite structure and operation is more than enough to decline the application of Section 112(6) treatment. *See M2M Sols. LLC v. Sierra Wireless Am., Inc.*, 2015 U.S. Dist. LEXIS 134558, at *12-16 (D. Del. Oct. 2, 2015) (presumption not overcome as to "processing module" because "the entire claim limitation recites sufficient structure for a person of skill in the art" as opposed to attempting to "capture any possible means for achieving [an] end."); *see also*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1300 (Fed. Cir. 2014) ("if a limitation recites a term with a known structural meaning, or recites either a known or generic term with a sufficient description of its operation, the presumption against means-plus-function claiming remains intact.").

And contrary to Defendant's argument, even if the Court were to hold that the claim term performs a function, that in and of itself, is not enough to overcome the presumption. *See, e.g.*, *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs.*, 301 F. Supp. 2d 914, 928 (W.D. Wis. 2003) ("[e]ven if the claim element specifies a function, if it also recites sufficient structure, material or acts within the claim itself for performing that function, § 112¶6 does not apply."), *citing Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997). A claim term may recite both structure and function without invoking Section 112(6).

All of the above is immutable when looking at the disclosures found in the specification, as confirmed by the testimony of one skilled in the art when reading those disclosures. *See, e.g.*, '857 Patent at Col. 53, l. 63 through Col. 54, l. 7; Col. 24, l. 59 through Col. 25, l. 2; Col. 25, ll. 3-20; Col. 23, ll. 24-44; Col. 22, ll. 7-29; Col. 31, ll. 47-62; Col. 28, ll. 50-59; Col. 53, ll. 1-65. The figures and written description go into great detail as to the structures, operation and capabilities of the claimed processor circuit. By way of example, Figures 5 and 9 (including elements 33a and

33b) disclose a processor circuit and its physical connections to the power system components such as the generator, load switches, and user inputs:



**Figure 5**

**Figure 9**

Figure 4 (including elements 23 and 24) and its description further explains supporting circuitry that facilitates the processor circuit to accept/send monitoring and control signals of the claim and how they are configured within the rest of the circuitry of the power system:



Figure 4

Additional disclosures may be found at Figures 8 and 12, 14, 15, 16, 17 (including elements 25c and 25d) and 18 (including element 37), along with their associated description. Dr. Zane has reviewed these disclosures, along with others listed in his Declaration, to confirm that one of ordinary skill in the art would understand the term "processor circuit" to connote sufficient structure such that it should not be governed by means-plus-function and should remain with its plain and ordinary meaning. Zane Decl. at ¶¶ 45-56.

Whether means-plus-function treatment should apply is a threshold question, and Defendant simply cannot overcome the presumption against applying Section 112(6). Should the Court agree, the analysis ends here. Should the Court decide means-plus-function applies to either of the terms identified by Defendant, Plaintiff would propose, in the alternative, the following functions and corresponding structures.

    **a) Plaintiff's Alternative Proposal to the Extent the Court Requires Section 112(6) Treatment of the Phrase "the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch"**

| Plaintiff's Alternative Proposal | Defendant's Proposal |
|---|---|
| Function: timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current | Subject to 35 U.S.C. § 112 ¶ 6 – Indefinite<br><br>Function: timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding |

| | |
|---|---|
| capacity of the power source selected by the transfer switch | the maximum output current capacity of the power source selected by the transfer switch |
| Structure: processor circuit, as set forth in '727 Patent, Col. 27, l. 61 through Col. 28, l. 29 et seq., and associated hardware for executing the identified claim language or similarly worded operations found in the specification, and equivalents thereto | Structure: None |

While Plaintiff believes strongly that Section 112(6) should not apply, out of an abundance of caution and solely in the alternative, Plaintiff has identified the above "function" for the claimed "processor circuit" of Claim 13 should the Court require means-plus-function application.  The identified "function" tracks the explicit language of the claim.  The "structure" likewise tracks the explicit language used in the specification, as detailed immediately above in both the written description and Figures.  As such, to the extent the Court finds means-plus-function applies, Plaintiff should be entitled to its proposed structure "and equivalents thereto."  *See, e.g.*, *Austin Hardware & Supply, Inc. v. Allegis Corp.*, 2020 U.S. Dist. LEXIS 178588, at *19 (E.D. Wis. Sep. 29, 2020) ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification ***and equivalents thereof***.") (emphasis added).

To the extent the Court applies means-plus-function treatment, the claim is nevertheless not indefinite.  Based on the multitude of disclosures found within the patent identified above (and in the Declaration of Dr. Zane), Defendant's assertion that the patents fail to disclose sufficient support for any claimed functionality rings hollow.  Defendant takes issue with two specific parts of the claim involving the load limiting circuits.  While Defendant appears to be referencing

language that is found elsewhere from Claim 13, Figure 6 and its associated disclosure (along with the citations listed above) nevertheless details the circuitry for load limiting:



Figure 6

*See also*, related discussion in the specification for Figure 6 at Cols. 31 through 36 (including Col. 31, ll. 51-66 and Col. 32, ll. 14-27); Zane Decl. at ¶¶ 59-63.

Defendant's final argument, that the concept of a maximum current capacity is not taught, is similarly untrue. In addition to the above citations, *see also* Col. 25, l. 42 through Col. 26, l. 25; Zane Decl. at ¶¶ 64-65. The specification is replete with disclosure for the processor circuit as well as what it does with this information, including as it relates to an overload. *Id.*

b) **Plaintiff's Alternative Proposal to the Extent the Court Requires Section 112(6) Treatment of the Phrase "the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter"**

| Plaintiff's Alternative Proposal | Defendant's Proposal |
|---|---|
| Function: timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter | Subject to 35 U.S.C. § 112 ¶ 6 – Indefinite<br><br>Function: timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they |

16

| Structure: processor circuit, as set forth in '727 Patent, Col. 27, l. 61 through Col. 28, l. 29 et seq., and associated hardware for executing the identified claim language or similarly worded operations found in the specification, and equivalents thereto | are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch |
|---|---|
| | Structure: None |

As with the above "processor circuit" term, Section 112(6) should not apply  But out of an abundance of caution and solely in the alternative, Plaintiff has identified the above "function" for the "processor circuit" of Claim 37 should the Court require means-plus-function application.  The "function" tracks the explicit language of the claim.  The "structure" likewise tracks the explicit language in the specification, as detailed immediately above.  As with the last term, Plaintiff should be entitled to its proposed structure and equivalents thereto.

Defendant does not identify any further reason, apart from those already raised in conjunction with Claim 13, that Claim 37 should be found indefinite.  Thus, to the extent the Court applies means-plus-function treatment, the claim is nevertheless not indefinite for the reasons already set forth above.  *See also*, Col. 4, ll. 50-56; Col. 8, l. 59 through Col. 9, l. 6; Col. 9, ll. 7-25; Col. 9, l. 61 through Col. 10, l. 1; Col. 25, l. 42 through Col. 26, l. 25; Zane Decl. at ¶¶ 66-69.

## D. All Remaining Terms Should Be Afforded Their Plain and Ordinary Meaning and Defendant's Request for a Finding of Indefiniteness Should Be Denied

Defendant has proposed nine additional terms for construction.  For seven of those terms, Defendant has not proffered any construction at all, but has instead asked the Court for a finding of indefiniteness.  For the last two terms, Defendant has set forward a definition, albeit not in keeping with the intrinsic record or controlling precedent.  Before addressing the remaining nine terms, it is worth noting several applicable legal principles regarding indefiniteness.

The "same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Wash World, Inc. v. Belanger, Inc.*, 2021 U.S. Dist. LEXIS 45258, at *5 (E.D. Wis. Mar. 9, 2021), *citing Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). Indefiniteness requires a showing by **clear and convincing evidence** that the claim, read in the light of the intrinsic record, fails to inform those skilled in the art about the scope of the invention "with reasonable certainty." *Id.*, *citing Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). This test "mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus*, at 910. And to be clear, a court may rely on expert testimony in determining whether a claim term is indefinite. *Wash World*, *citing Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018). Here, Defendant (having the burden to establish indefiniteness by clear and convincing evidence), submitted no testimony, evidence or opinion whatsoever in support of its Opening Brief.

### 1. "via the connection or sensor coupled to the line connection"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Indefinite |

With respect to this phrase, Defendant takes a myopic view of Claim 1 of the '618 Patent. The language of limitation (d) is as follows:

> d) the processor circuit coupled to the line and control connections of the contactor and executing a program whereby via the connection or sensor coupled to the line connection the processor is responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection to cause a load shed by opening the contactor to either relieve an actual overload or prevent a potential overload of the power source, or both, and following the load shed after at least a known time period the processor closes the contactor to resupply power to the first load, the known time period responsive to the configuration of the load coupler.

As expressly written, the claimed "processor" is described immediately before "via the connection" as being coupled to "the line and control connections[.]" Thus, there are not three types of connection choices as Defendant suggests, but rather only two. And the subsequent

language goes on to specify "via the connection or sensor coupled to the line connection[.]" The connection being referred to is the line connection and it is via the connection coupled to the line connection or via the sensor coupled to the line connection.

A finding of indefiniteness requires clear and convincing evidence, and here, Defendant cannot meet that heightened standard based on a plain reading of the claim. While the analysis can and should end there, the record also includes the testimony of one skilled in the art. According to Dr. Zane, reading this claim term in light of the remainder of the surrounding claim language results in no ambiguity and informs him as to the scope of the invention. Zane Decl. at ¶¶ 72-75.

Defendant's reliance on *Midwest*, an out-of-district opinion from W.D.N.Y., is misplaced. There, the claim at issue first used the phrase "fixed component of the module", next used the phrase "two or more printing engines", and finally used the phrases "a first printing engine to a second printing engine" and "as measured by the second engine and the measuring of the printing modules[.]" *Midwest Athletics and Sports Alliance LLC v. Xerox Corp.*, 2020 U.S. Dist. LEXIS 242830, at *53 (W.D.N.Y. Dec. 28, 2020). While the court correctly noted "[a] failure to provide antecedent basis does not necessarily render a claim indefinite" if "despite the absence of explicit antecedent basis the scope of a claim would be reasonably ascertainable by those skilled in the art", the above inconsistencies in the claims left it unascertainable what the particular limitations meant. Here, we do not have an antecedent basis issue, much less one that would leave one of ordinary skill in the art unable to determine the scope of the claim.

The facts here are more akin to those before this Court in *Wash World*, 2021 U.S. Dist. LEXIS 45258 at *22. There, the plaintiff sought declaratory relief of non-infringement by alleging the terms "first line" and "second line" rendered the claims indefinite. The plaintiff argued that even though the independent claim included a "first line" and "second line", because the claims did not identify "the location and direction of the nozzles and light sources, unlike, for example, Dependent Claim 11, they are indefinite." *Id*. The Court rejected this argument, looking instead to the testimony of one skilled in the art. "[A] POSITA would easily understand 'first line' and 'second line' as they are used in the claims 1 and 15, to refer to two lines in which the nozzles and

light sources are arranged, especially in light of these disclosures in the specification and file history." *Id*. at \*23. In light of this testimony, the Court correctly concluded that the heightened standard of indefiniteness was not met. The same approach and result holds true here.

## 2. "the priority"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Indefinite |

With respect to "the priority", Defendant's three arguments fail to support a finding of indefiniteness. First, "priority" needs no antecedent basis. For each of dependent claims 6, 14, 20, and 27 of the '618 Patent, "the priority" is the first time that term appears. And in each instance, the claims are describing corresponding disclosure in the written description for the concepts of using importance as it relates to priority of the loads. *See, e.g.*, Col. 7, ll. 32-34; Col. 55, l. 47 – Col. 56, l. 24; Col. 57, ll. 20-34; Col. 59, l. 35 – Col. 60, l. 32; Col. 60, l. 60 – Col. 61, l. 46. Further, each dependent claim must be read in context of the independent claim from which it depends. Take, for example, Claim 6 which depends on Claim 1. In Claim 1, a load coupler device is described as having a user input circuit as stated in limitation (c). Then, Claim 6 further describes how the claimed load coupler device may assign "the priority" of the first load "via the user input circuit[.]" The independent claim sets forth a user input circuit, and the dependent claim sets forth how the input circuit is used to assign priorities to loads. This is true in each of the other dependent claims cited by Defendant.

Second, Defendant is incorrect in their blanket recitation of the law. Even if one were to assume a lack of antecedent basis (which there is not), that is not automatically render a claim indefinite. To the contrary, as recognized by Defendant's own case law cited in the immediately preceding section of its brief. *Midwest*, at \*53 (lack of antecedent basis alone cannot satisfy the heightened burden of indefiniteness, instead one turns to whether one ordinarily skilled in the art

could nevertheless ascertain the scope of the claim). This is exactly the analysis performed here, and upon which the Court may now rely. Dr. Zane reads the dependent claims in the context of both the independent claims and the specification, to correctly conclude that one skilled in the art would have no impediment in understanding the scope of the claims. Zane Decl. at ¶¶ 78-80.

Third, aside from attorney argument, Defendant has set forth no basis for its assertion that the term "priority" is arbitrary, subjective, or otherwise unrestrained. To the contrary, the use of "priority" is replete in the specification, as noted above. Again. Dr. Zane has confirmed that the term is used throughout the specification detailing preferred embodiments using importance as it relates to priority of the loads. *Id.* (citing half a dozen specification citations supporting his opinion that the claim is not indefinite). Defendant's argument on this point seems to be rooted in a desire to import limitations into the claim, which is expressly forbidden. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004); *see also Ameritox, Ltd. v. Millennium Health, LLC*, 88 F.Supp.3d 885, 896 (W.D. Wis. 2015) (*citing Innova* and noting "[c]laim construction, therefore, requires a scalpel, not a sledgehammer because there is a thin line between **interpreting** the claims in view of the specification and improperly **reading** limitations from the specification into the claim.") (emphasis in original). Here, the plain reading of the claims, and as understood by one of ordinary skill in the art, does not require any importation of "criticality" or the like. Zane Decl. at ¶¶ 78-80. All that is required is the ability to set a priority which is exactly what both the claims and the specification disclose in detail. Once again, Defendant cannot meet its heightened burden to establish indefiniteness.

### 3. "unavoidable electronic circuit propagation delay time duration"

| Plaintiff's Proposal | Defendant's Proposal |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

Defendant takes another deliberately obtuse reading of the claims, this time with Claim 7 of the '618 Patent. In making its first argument, that the terms themselves fail to carry ascertainable meaning, it is telling that Defendant yet again includes no supporting citation from one having skill in the art. Plaintiff, on the other hand, points to the explanation provided by Dr. Zane. Contrary to Defendant's attorney-argument, the concept of unavoidable propagation delay is readily understood by those skilled in the art as a characteristic of circuitry that affects electronic signals which pass through the circuit. Zane Decl. at ¶ 83. And contrary to Defendant's allegations, the patentee was not required to point to anything in the specification for a concept that is readily understood by a skilled artisan. The Federal Circuit has stressed this concept for over forty years. *See, e.g.*, *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("a patent need not teach, and preferably omits, what is well known in the art."); '727 Patent, Col. 2, ll. 5-7. The phrase here is distinguishable from the cases cited by Defendant where the words of the claim had no discernable meaning. The words used in the claim here, whether taken alone or in combination, do not result in a conclusion of indefiniteness.

Defendant's argument that the specification does not include the word "unavoidable" is a red herring for yet another reason. As set forth above, the intrinsic record is the most important consideration when reviewing the meaning of a term, and the intrinsic record consists not only of the patent specification but the prosecution history as well. Here, there is a direct discussion of this claim term found within the July 15, 2020 Office Action and Response thereto. In its Office Action, the Examiner noted that even in a situation where time duration is zero, "no such electrical circuit is an absolute zero and takes some, albeit micro level time, to react wherein said 'time duration' is said micro level[.]" July 15, 2020 Office Action at p. 8. In the Response to the Office Action, the patentee clarified that the concept of unavoidable propagation delay that is present in

all electronic circuits is not the time duration that is referred to in the claim. August 12, 2020 Response at p. 6. The ensuing Notice of Allowance makes clear the Examiner knew exactly the distinction the patentee was referring to in his amendment and argument.

In other words, the patentee clarified that his claim was not intended to be directed towards the time delay that is necessarily present in the propagation delay present in all electric circuits that is therefore "unavoidable," but rather to a separate "known" delay. This is all confirmed when reading the Claim 7 of the '618 Patent in its entirety: "The load coupler device of claim 1 wherein the processor circuit determines when to cause a load shed in response to a known and greater than an unavoidable electronic circuit propagation delay time duration of an overload." The use of the words "known and greater than" is in keeping with the patentee's statements made in the file history clarifying the distinction between a known period of time and a period of time corresponding to an unavoidable electronic circuit propagation delay. Dr. Zane's understanding is in line with all of the above. Zane Decl. at ¶¶ 83-85.

**4.    "The load coupler device of claim 1 wherein the processor circuit causes a load shed in response to the amount of total load on the power source, the amount of total load being determined by an electronic circuit which is part of a control system of the power source"**

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Indefinite |

With respect to this "load coupler" term, Defendant once again advances its indefiniteness theory solely by misreading the claims. The claim, as written, is directed towards an apparatus (the "load coupler device of claim 1") with particular capabilities. Specifically, a load coupler device configured to receive inputs and capable of acting on those inputs. This is a straightforward and common way of claiming an apparatus. Claim 12 does not impermissibly mix apparatus and method steps, nor does it claim a "thing" together with steps that must be performed by said

"thing." Instead, Claim 12 claims a structure defined in part by what it is capable of doing, which is entirely permissible under longstanding Federal Circuit precedent.

The present facts are different than those raised by Defendant in its cited cases, and are more akin to those found in *HTC*.[2] There, the claimed "mobile station" did not "recite a mobile station and then have the mobile station perform the six enumerated functions," but rather, the claim "merely establish[es] those functions as the underlying network environment in which the mobile station operations." *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1277 (Fed. Cir. 2012); *see also*, *Mastermine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307 (Fed. Cir. 2017) (even though the claim "includes active verbs – presents, receives, and generates- these verbs represent permissible functional language used to describe capabilities of the claimed reporting module"). Here, Claim 12 does not require user action, nor is the claimed load coupler device incapable of infringement unless there is user action. This is distinguishable from the facts at issue in the *Barkan* case relied on by Defendant. There, the independent claim was directed towards an "add-on base station" and the dependent claim required the station "actually *is* owned and installed by an individual or entity[.]" *Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*, 2019 U.S. Dist. LEXIS 20394 at*890-90 (E.D. Tex. Feb. 7, 2019) (emphasis in original).

---

[2] Defendant relies upon the *UltimatePointer* holding to define indefiniteness, but omits the language immediately following (in the same paragraph) that cuts directly against its argument: "[A]pparatus claims are not necessarily indefinite for using functional language." *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016). If an apparatus claim "is clearly limited to a[n apparatus] possessing the recited structure and capable of performing the recited functions," then the claim is not invalid as indefinite. *Id.* In *UltimatePointer*, the patents at issue related to a handheld device containing an image sensor capable of data generation and a processor. The dependent claims at issue clarified the capability and relationship between the data generation and processor and did not require the user to take any affirmative actions. *Id.* at 826-827. The court held the claims were not indefinite. *Id.* at 827-828 ("Unlike the claims in *IPXL* and *Katz*, the claims do not recite functionality divorced from the cited structure. Therefore, the claims do not reflect an attempt to claim both an apparatus and a method, but instead claim an apparatus with particular capabilities.").

Defendant's arguments are also at odds with the understanding of one skilled in the art. Dr. Zane confirms Plaintiff's position is the correct reading of the claim as written. With respect to Defendant's argument regarding the "control system" being separate from the claimed load coupler, a plain reading of the claim (again, confirmed by Dr. Zane) does not assign boundaries to the so-called control system. Zane Decl. at ¶¶ 88-90. In other words, the control system could be within or outside the claimed load coupler device and that would not change the fact that the claimed load coupler must merely respond to certain information in order to cause a load shed.

**5.** **"the drop in frequency representing a known amount of power being supplied by the second power source"**

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Indefinite |

This phrase is self-explanatory, particularly when read in light of the specification, is not indefinite and should be afforded its plain and ordinary meaning. Claim 23 reads in full:

> 23. The small backup power system of claim 17 wherein in e) the processor circuit causes a load shed in response to sensing, at the line terminal of the contactor, a drop in the frequency of the power provided by the second power source the drop in frequency representing a known amount of power being supplied by the second power source.

As this Court readily appreciated at the Motion to Dismiss hearing, the improvement set forth by the patents is one of proactivity rather than simply quantifying frequency drop. Thus, Plaintiff disagrees with the characterization of the invention set forth in Defendant's Brief wherein it paints the "alleged improvement" as being "magnitude" as opposed to "occurrence" of frequency change. And in any event, this is a red herring to the task before the Court now. The question is not whether the claim covers a so-called "occurrence" or "magnitude", but rather whether one skilled in the art would be able to ascertain the meaning of "drop" as used.

Defendant's "magnitude" versus "occurrence" arguments do not appear in the claims and only interject a so-called choice where one does not exist. The claimed "drop in frequency", when read in light of the specification, refers to a decrease (or lowering) in frequency. The specification provides multiple examples. *See, e.g.*, '618 Patent at Col. 57, ll. 17-22. The "drop" in Claim 23 simply represents a known amount of power being supplied. In other words, in the power being supplied by the second power source there is a drop or decrease from a first frequency to a second frequency and because it is a drop, the second frequency is lower than the first frequency. The fact that the first and second frequencies are not specified does not make the claim indefinite, particularly because one of ordinary skill in the art knows the metes and bounds of what the claim covers from the teachings found throughout the intrinsic record. By way of example, the discussion starting at '618 Patent Col. 56, line 42 and continuing through Col. 58, ll. 55 provides a lengthy description of preferred embodiments utilizing one or more parameters (including frequency) of the power output to convey load information. Dr. Zane confirms that this claimed phrase, when read in light of the disclosures found within the specification, is not indefinite to one having ordinary skill in the art. Zane Decl. at ¶¶ 93-96.

6.     **"The load coupler device of claim 1 wherein before the processor circuit would otherwise close the contactor to resupply power to the first load when the known time period elapses, in response to one or more of: i) the voltage of the power provided to and sensed at the contactor line connection, ii) the frequency of the power provided to an sensed at the contactor line connection, iii) the total load on the power source, iv) or, via a current transformer, the total current being supplied by the power source, the processor first determines at least one of whether the power source is already overloaded or if connecting the first load will cause the   power source to become overloaded, and if one of these conditions exists, the processor does not close the contactor thus preventing the first load from being connected to the power source"**

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Indefinite |

Defendant's argument on this load coupler term in Claim 16 of the '618 Patent is flawed for the same reasons as set forth above with respect to Claim 12. For sake of brevity, those same arguments apply equally here. The claimed load coupler device of Claim 16 is similarly described as an apparatus and wherein the processor circuit has the capability to receive input and act on those inputs. In other words, there is information that the load coupler is capable of responding to resupply power. With respect to Defendant's reference to the current transformer, Dr. Zane once again confirms that a current transformer would be a circuit option for the current sensors or load monitors shown throughout the figures and specification. Zane Decl. at ¶¶ 99-100, *citing* 23a of Figs. 4 and 8, 23b of Fig. 6, 23d of Figs. 14-16.

**7.** **"responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection"**

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Indefinite |

A plain reading of the claim as written easily disposes of Defendant's last indefiniteness argument. Limitation (d) of Claim 1 of the '618 Patent reads:

> "the processor circuit coupled to the line and control connections of the contactor and executing a program whereby via the connection or sensor coupled to the line connection the processor is responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection to cause a load shed by opening the contactor to either relieve an actual overload or prevent a potential overload of the power source, or both, and following the load shed after at least a known time period the processor closes the contactor to resupply power to the first load, the known time period responsive to the configuration of the load coupler."

The claim as written covers multiple embodiments so long as the processor circuit is responsive to 1) the total amount of load on the power source; and 2) one or more of the listed "voltage, current or frequency of the electric power[.]" To clarify, the claim requires response to total load, and any one (or more) of the other listed characteristics. To meet the claim limitation, it is possible to use voltage and current and to multiply them to derive power, and this meets both

claimed limitations of total power and voltage and current. In other scenarios, one could separately measure power and voltage, and nevertheless meet the claim limitation. This is all confirmed by Dr. Zane. Zane Decl. at ¶¶ 103-104. As with the other terms above, Defendant cannot establish, much less under its heightened burden of clear and convincing evidence, that the terms of the Patents-in-Suit are indefinite.

8.    "sine wave distortion"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Plain and Ordinary Meaning, which is "deviation from an ideal sine wave" |

Defendant addresses the final two claim terms, "sine wave distortion" and "sine distortion", in tandem. While Defendant offers its own preferred construction, it does not set forth either of the two exceptions to the "general rule" that would provide a basis for deviating from the default plain and ordinary meaning. In fact, Defendant prefaces its argument with a concession that the words chosen by the patentee are "a commonly understood term even to a layperson[.]" If that is the case, it begs the question as to why the Court should feel compelled to construe the terms at all, which is exactly why Plaintiff advocates for leaving the terms as written.

Rather than point to lexicography or disavowal, Defendant appears to believe a construction is necessary because of a so-called dispute amongst the parties that Plaintiff was unaware of until Defendant's filing. Regardless, Defendant's proposal should be denied for multiple independent reasons.

First, Defendant points to no portion of the specification that would mandate the term to be rewritten as "deviation from an ideal sine wave." Nor does Defendant point to any testimony from one having ordinary skill in the art to support its suggested modification to the phrase as written. Once again, its construction is based entirely on attorney argument.

Second, Defendant's proposed construction fundamentally alters the meaning of the claim and would read out embodiments present in the specification. By way of example, limitation (a) of Claim 66 of the '857 Patent further defines the claimed power system as comprising:

one or more non-utility type power source comprising at least an AC power generating circuit which outputs sinusoidal single or multiple phase AC power which may be controllably coupled to one or more of a plurality of loads, the AC power having a plurality of parameters including at least a frequency, a voltage, sine wave distortion and a current which may range from zero to a maximum amount depending on the loading of the power source

"Sine wave distortion" is listed as a parameter of the claimed "AC power." As confirmed by Dr. Zane, sine wave distortion, like frequency, voltage and current, is a natural characteristic of the output power. Zane Decl. at ¶¶ 107-109. And like frequency and voltage, sine wave distortion occurs within a numerical range. That being said, the claim does not require a specific range, but simply recognizes the existence of sine wave distortion as a parameter associated with the AC power. This is important because, in situations where the AC power source is operating within its normal operating specifications, sine wave distortion is likely zero or close to zero.

For at least this reason, Defendant's proposal, which would require a "deviation from an ideal sine wave" risks reading out of the claim situations where AC power is operating within its normal operating range such that the frequency is nominal and sine wave distortion is zero or near zero. *Id.* at ¶¶ 107-109. "As the Federal Circuit has repeatedly cautioned, such a construction would rarely if ever be correct and would require highly persuasive evidentiary support.'" *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 2011 U.S. Dist. LEXIS 7784, at *11 (E.D. Wis. Jan. 19, 2011), *citing Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1373 (Fed. Cir. 2005). At most, should the Court believe construction of this term is required, it should be construed as "the amount of deviation from an ideal sine wave." This alternative construction not only accounts for situations where there is distortion from an ideal sine wave but also remedies the error in Defendant's construction which seeks to improperly limit the scope of the term by not including situations where sine wave distortion is zero.

9. "sine distortion"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| Plain and ordinary meaning | Plain and Ordinary Meaning, which is "deviation from an ideal sine wave" |

All of the above points raised in connection with "sine wave distortion" apply equally to "sine distortion." In addition, Claim 71 further emphasizes the fault in Defendant's proposed construction. Claim 71 seeks to use the sine distortion of the AC power to provide or not provide AC power to at least one of the loads:

> The power system of claim 66 wherein in (c) the load manager circuit is responsive to the AC power frequency and to at least the sine distortion of the AC power to provide or not provide AC power to the at least one of the one or more of a plurality of loads.

Under the claimed system, power will be provided in situations where there is no or limited sine wave distortion which indicates that output power is being provided within a power source's operating specifications. Conversely, power may not be provided where there are higher levels of sine wave distortion, indicating power is being provided outside the specification range. Zane Decl. at ¶¶ 112-114. Defendant's construction only addresses one of these situations and risks reading out the other. Because the claim uses the presence or absence of sine wave distortion to make decisions regarding where to provide power or not, and Defendant focuses solely on the presence of distortion, Defendant's proposed construction is improper. As with the term "sine wave distortion" above, should the Court feel compelled to construe this term, it should at most be construed to read as "the amount of deviation from an ideal sine wave."

## V. CONCLUSION

In the end, Plaintiff's constructions are consistent with the Federal Circuit's guiding principles of claim construction and the claims as written when viewed in light of the specification. Plaintiff respectfully requests the Court adopt its positions and deny Defendant's requests for means-plus-function application and any findings of indefiniteness.

Dated:  February 13, 2026.    */s/ Dave R. Gunter*

Jonathan T. Suder
Dave R. Gunter
Alexander N. Yow
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
Telephone: (817) 334-0400
Facsimile: (817) 334-0401
jts@fsclaw.com
gunter@fsclaw.com
ayow@fsclaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2026, the foregoing document was filed using the Court's CM/ECF system and notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Dave R. Gunter*