# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# MILWAUKEE DIVISION

PSLC LLC

    *Plaintiff*,

v.

GENERAC POWER SYSTEMS, INC.,

    *Defendant*.

C.A. No. 2:24-cv-01270-PP

**GENERAC POWER SYSTEMS, INC.'S
REPLY IN SUPPORT OF OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

DISPUTED CLAIM TERMS ............................................................................................ 1

    A.    "the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch." ('727 Patent, Claim 13) ....................................................... 1

    B.    "the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter." ('727 Patent, Claim 37) ................................................. 7

    C.    "small backup power system" ........................................................................... 7

    D.    "terminal" ......................................................................................................... 8

    E.    "via the connection or sensor coupled to the line connection" ...................... 9

    F.    "the priority" ................................................................................................... 9

    G.    "unavoidable electronic circuit propagation delay time duration" .............. 10

    H.    "the drop in frequency representing a known amount of power being supplied by the second power source" ....................................................................................... 11

    I.    "[T]he processor circuit causes a load shed in response to the amount of total load on the power source, the amount of total load being determined by an electronic circuit which is part of a control system of the power source" ........................................... 12

    J.    "The load coupler device of claim 1 wherein before the processor circuit would otherwise close the contactor to resupply power to the first load when the known time period elapses, in response to . . . via a current transformer, the total current being supplied by the power source, the processor first determines at least one of whether the power source is already overloaded or if connecting the first load will cause the power source to become overloaded, and if one of these conditions exists, the processor does not close the contactor . . ." ............................................................................................. 13

    K.    "responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection" ..................................................................................................................... 14

    L.    "sine wave distortion" / "sine distortion" ..................................................... 15

    M.    "power grid" .................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Ground Info. Sys. Inc. v. Life360, Inc.*,
   830 F.3d 1341 (Fed. Cir. 2016)......................................................................................1

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
   2012 WL 2993856 (N.D. Cal. 2012) ..............................................................................8

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008)...................................................................................2, 5

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997)......................................................................................4

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)...............................................................................12, 14

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)....................................................................................10

*Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*,
   803 F.3d 620 (Fed. Cir. 2015).....................................................................................7, 9

*Epos Techs. Ltd. v. Pegasus Techs.*,
   766 F. 3d 1338 (Fed. Cir. 2022)...................................................................................12

*Function Media, LLC v. Google, Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013)......................................................................................2

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014)...............................................................................12, 14

*HTC Corp. v. IPCom GmbH & Co.*,
   667 F.3d 1270 (Fed. Cir. 2012)....................................................................................13

*M.E.C. v. Texas Instruments Inc.*,
   520 F.3d 1367 (Fed. Cir. 2008)....................................................................................13

*M2M Sols. LLC v. Sierra Wireless Am., Inc.*,
   2015 U.S. Dist. LEXIS 134558 (D. Del. Oct. 2, 2015) ................................................3

*Mirror Worlds Techs, LLC v. Meta Platforms*,
   122 F. 4th 860 (Fed. Cir. 2024) ...................................................................................15

*O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)..........................................................................................8, 15

*Omega Engineering, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)..................................................................................................9

*Pause Tech., LLC v. TiVo, Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005)................................................................................................13

*Rembrandt Data Techs., LP v. AOL, LLC*,
   641 F.3d 1331 (Fed. Cir. 2011)..........................................................................................12, 14

*Storage Tech. Corp. v. Cisco Sys. Inc.*,
   329 F.3d 823 (Fed. Cir. 2003)....................................................................................................9

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002)................................................................................................10

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015)..................................................................................................6

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997)..................................................................................................8

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F. 3d 1576 (Fed. Cir. 1996)...........................................................................................12, 15

*Warner Chilcott Co., LLC v. Mylan Inc.*,
   2013 WL 3336872 (D.N.J. 2013) ..............................................................................................8

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) (en banc).........................................................................1, 3, 7

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)..................................................................................................2

*WSOU Investments LLC v. Google LLC*,
   2023 WL 6889033 (Fed. Cir. Oct. 19, 2023).............................................................................2

**Statutes**

35 U.S.C. § 112 ¶ 2 ............................................................................................................7, 9

35 U.S.C. § 112 ¶ 6 ................................................................................................... *passim*

iii

# DISPUTED CLAIM TERMS

A. **"the processor circuit being programmed to timely monitor the current provided to the one or more loads of the group of loads when they are powered by the generator and to timely monitor the group of loads when they are powered by the power grid operating in advance and when necessary to communicate with one or more loads or corresponding load modules of the group of loads to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch." ('727 Patent, Claim 13)**

PSLC and its expert ignore that their proposed structure is essentially a generic processor, that computer-implemented functions can be subject to § 112 ¶ 6 even without the magic words of "means for," and that generic processors programed to perform functions require as their structure an identification of a corresponding algorithm for performing the claimed function. PSLC and its expert also ignore that the patent does not specify a means to select or measure which "maximum output current capacity" is "*the* maximum output current capacity."

Although this term is presumed to not be in means-plus-function form, that presumption is not "strong" and easily overcome here. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015) (en banc) (the rebuttable presumption exists but is not "strong"). PSLC relies primarily on its inventor's intent. *See* Dkt. 43 at 9. But his statements were made during prosecutions of his *other* patents, not during prosecution of the '727 patent. Regardless, the claim language determines whether it is subject to § 112 ¶ 6—not purported intent of the inventor. *See Advanced Ground Info. Sys. Inc. v. Life360, Inc.*, 830 F.3d 1341, 1348 (Fed. Cir. 2016) (looking to the "combination of the terms as used in the context of the relevant claim language.").

### *The term "processor circuit" is subject to § 112 ¶ 6*

Claim 13 is subject to § 112 ¶ 6 because it uses purely functional language and any purported structure is just a general-purpose computer. Although PSLC argues it is sufficient for this claim limitation to refer to a specific class of structures, Dkt. 43 at 9, the '727 Patent

1

specification demonstrates otherwise. The "processor circuit" can be "*any* type(s) of circuit devices currently known *or which will become to be known*." '727 Pat. at 28:8–14 ("including but *not limited to analog and digital circuits*, LSI, VLSI, ASIC, PLD, CPLD, FPGA, DSP, IP Core, Array, microcontroller, microprocessor, Multicomputer, RISC or CPU integrated circuits."). At best, what PSLC, its expert, and the specification describe is a generic computer processor that can be programmed to manipulate data in computer control systems. Ex. A ¶¶ 38, 40. Federal Circuit law holds that such a generic "processor" lacks sufficient structure and is subject to § 112 ¶ 6. *See WSOU Investments LLC v. Google LLC*, 2023 WL 6889033 at *4 (Fed. Cir. Oct. 19, 2023) (finding "processor" subject to 112 ¶ 6 where the "specification treats the word 'processor' so broadly as to generically be any structure that manipulates data").

PSLC also ignores that "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general-purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348–49 (Fed. Cir. 1999). The Federal Circuit has "consistently required that the structure disclosed in the specification be more than simply a general-purpose computer or micro-processor." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008); *see also Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (same).

The claimed functions are not inherent to a generic "processor." *See* Ex. A ¶ 40. This is apparent in the function "programmed to . . . prevent exceeding the maximum output current capacity of the power source." This recites a functional result at the point of alleged novelty—not the algorithm a general-purpose processor executes to achieve that result. *See* Dkt. No. 12 at 9 (arguing the invention is directed to preventing an overload rather than reacting to one). The lack

2

of such an algorithm in Claim 13 requires the specification provide the algorithm for the claimed function. Ex. A ¶ 51; *see Williamson*, 792 F.3d at 1349 (finding term subject to § 112 ¶ 6 where it "is simply a generic description for software or hardware that performs a specified function.").

This differs from the "processing module" in *M2M Sols. LLC v. Sierra Wireless Am., Inc.*, 2015 U.S. Dist. LEXIS 134558, at *12–16 (D. Del. Oct. 2, 2015), which PSLC relies upon at Dkt. 43 at 12. The "processor module" in *M2M* claimed a functional result—"for authenticating an at least one transmission sent from a programming transmitter and received by the programmable communicator device"—but also claimed both the information to describe the "transmission" input into the processor module and the steps it takes to achieve the functional result based on that input. *M2M*, 2015 U.S. Dist. LEXIS 134558, at *12. First, the claim recited that the "transmission includ[ed] a coded number and at least one telephone number or Internet Protocol (IP) address corresponding to an at least one monitoring device." *Id.* Second, the claim specified the steps needed to determine whether to authenticate: "by determining if the at least one transmission contains the coded number [and] authenticating the at least one transmission if the transmission includes the coded number." *Id.* Claim 13, though, is incomplete in this respect. Although it recites that the processor monitors current to the loads and communicates with devices to control the current, there are no steps in Claim 13 for at least (1) how the processor circuit determines what "*the* maximum output current capacity" of the power supply is and (2) how to determine what should be communicated to the "one or more loads or corresponding load modules of the group of loads" to prevent exceeding it. Ex. A ¶ 53. Thus, Section 112 ¶ 6 governs, and the claim must be limited to steps described in a corresponding algorithm in the specification (if there is any).

***PSLC's proposed structure fails to identify any algorithm for the claimed functions.***

PSLC does not address its failure to include any algorithm in its proposed structure. As

3

explained above, it must include at least an algorithm "to control the current consumed thereby to prevent exceeding the maximum output current capacity of the power source selected by the transfer switch." *See* Ex. A ¶ 51. Proper construction of a term subject to § 112 ¶ 6 requires identifying as structure the corresponding algorithm the processor is programmed with to perform the function. *See* 35 U.S.C. § 112 ¶ 6 ("such claim shall be construed to cover the corresponding structure … described in the specification and equivalents thereof").

PSLC's proposed structure—"'727, Col. 27, l. 61 through Col. 28, l. 29 et seq."—fails to do this. The cited passage merely defines "processor circuit" as a generic computing device. Ex. A ¶ 40. The use of "et seq" to capture half of the specification does not satisfy § 112 ¶ 6's requirement to particularly identify "corresponding" structure. Ex. A ¶ 39. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."). PSLC's proposal fails to "point out and distinctly claim [the] particular means." *Id.*

For example, PSLC concedes the claimed functions require, in part, communication with "load limiting circuits" that modularly limit current to the load, as opposed to simply switching the power on or off. *See* Dkt. 41 at 8–9; '727 Pat. at 3:13–18 ("If the teaching is with respect to controlling the amount of current or load (as compared to simply switching the current or load on or off) . . . a simple on/off type of switch is not meant."). This function therefore requires some algorithm to detail the inputs received, decision steps taken in response, and outputs communicated to determine how to so limit the current to the load to prevent exceeding the claimed maximum value. *See* Ex. A ¶¶ 46–51. The claim should not cover algorithms where controlling current consumption can be achieved simply by switching loads on and off. '727 Pat. at 3:13–18. PSLC's

4

proposed structure fails to point out the algorithm(s) covered by the claimed function and excludes those which the inventor expressly stated, "is not meant." *Id.* Similarly, PSLC does not point to any algorithm for determining what "the maximum output current capacity" of the power supply is. Ex. A ¶ 54. As explained below, PSLC cannot, because the specification does not provide one.

### *PSLC fails to address the lack of a corresponding algorithm regarding "prevent exceeding the maximum output current capacity"*

Ultimately, the claim is fatally defective with respect to the function "prevent exceeding the maximum output current capacity." PSLC mistakenly alleges that Generac's argument is "the concept of a maximum current capacity is not taught." Dkt. 43 at 16. Not so. The problem is the specification taught a given power source may have multiple such "maximums" that may be constantly changing based upon the environment, but it does not specify which "maximum" is "*the* maximum" the processor uses in its determination. *See, e.g.*, '727 Pat. at 12:62–13:23. Moreover, there are multiple ways to measure current, and the specification provides no guidance for a POSITA to choose among these methods for it to know what "*the* maximum" is. *Id.*

PSLC relies only on its expert's suggestion that "the claim simply requires that the power grid and generator each have a maximum output current capability" and "[t]his capability may be set by the installer when commissioning the equipment." Dkt. 43 at 16 (citing Zane Decl. ¶¶ 64–65). But neither PSLC nor its expert points to any corresponding portion of the specification for this. That a person of ordinary skill in the art could devise an algorithm is insufficient. *Aristocrat*, 521 F. 3d at 1336–1337 ("The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing that structure.") (quoting *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007)). Additionally, PSLC's reliance on "capability" to shed light on the "capacity" is misplaced. The inventor intended "capability" and "capacity" to mean two different

5

things. '727 Pat. at 2:24–28 ("A given power source has a ***maximum load handling capability*** dictated by the power generation and delivery path (e.g. pressure, voltage, pipe size, wire size) ***or a maximum output*** (e.g. dictated by the design of the power source and the system it is used in).") (emphasis added).

As explained in Generac's opening brief and Dr. Leeb's response to PSLC's expert, a person of ordinary skill in the art would understand that a given power supply can have multiple conflicting candidates for a "maximum output current capacity." Dkt. 41 at 9; Ex. A ¶¶ 54–61. There could be a "safe" maximum after which damage occurs. *See* '727 Pat. at 3:56–62. There could be a separate maximum at which a breaker trips. *See id.* at 18:28–45. There could be different maximums when used "as a backup source" rather than as "a prime power source." *See id.* at 3:67–4:4; Dkt. 41. at 9–10. A manufacturer could specify one or more maximums that governs internal behavior, but communicate a different "rated" maximum to installers. Ex. A ¶¶ 59–60. The specification also notes that any "maximum" "may at times change or be adjusted." '727 Pat. at 10:9–21. Additionally, a "maximum" might arbitrarily depend on the "duration of the load." *Id.* at 3:47–55. Given that the inventor defined an "overload" as potentially not being an overload unless the condition extends "for longer than a specified period," it is problematic that the claim and specification does not provide an algorithm for determining whether a duration matters, what it is, or how to determine the operative "maximum" based upon it.

Along the same lines, the claim and specification do not provide an algorithm for measuring the "current" at issue. There is no singular calculation for the output current of an AC power supply. There are several different measurements one could choose from. *See* Ex. A ¶ 62. The patent is silent how to determine which calculation or measurement governs. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1338 (Fed. Cir. 2015) ("There are three

6

different measures of molecular weight relevant to this appeal: peak average molecular weight (Mp), number average molecular weight (Mn), and weight average molecular weight (Mw). Each measure is calculated in a different manner. The claim does not specify which measure to use and in a typical polymer sample, Mp, Mn, and Mw have different values."); *Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620 (Fed. Cir. 2015).

At bottom, the fatal issue with this term is that there is no definite algorithm disclosed in the specification by which "processor circuit" determines which maximum parameter to use, how to calculate it, how to use it, and steps to achieve the stated function of preventing exceeding it. The inventor may have provided the public a lengthy musing on the topic of proactive load management, but he did not "particularly point[] out and distinctly claim[] the subject matter [he] regards as the invention." 35 U.S.C. § 112 ¶ 2. Claim 13 of the '727 Patent is indefinite.

**B.** **"the processor circuit being programmed to timely monitor the current provided to the loads by said DC to AC inverter and to prevent exceeding the maximum current capacity of the DC to AC inverter." ('727 Patent, Claim 37)**

Likewise, PSLC fails to include in its proposed structure an algorithm for the functionality of Claim 37 required by such claims subject to § 112 ¶ 6 that are performed on computers. Like in Claim 13, "processor circuit" in Claim 37 is defined so broadly and generically in the specification as to include any structure that involves processing data in control systems. *See Williamson*, 792 F.3d at 1349. As above, the issue here is whether the specification discloses an algorithm with a definite "maximum current capacity of the DC to AC inverter" and steps for preventing exceeding that value, not just the concept of a maximum current capacity. The specification discloses no such algorithm. This term is also improperly claimed under § 112 ¶ 6. *See* Ex. A ¶¶ 53–58.

**C.** **"small backup power system"**

PSLC conflates the threshold inquiry. The Court does not begin by deciding whether a term should be construed per the inventor's lexicography—the claim may not differ from the ordinary

7

meaning. So, the Court must first determine whether to construe the term at all. *O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise **an actual dispute** regarding the proper scope of these claims," the court "must resolve that dispute.").

PSLC has not shown that this term requires construction. When a term's use does not implicate a relevant dispute, construction is unnecessary. *See, e.g.*, *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *Warner Chilcott Co., LLC v. Mylan Inc.*, 2013 WL 3336872, *3 (D.N.J. 2013) (declining to construe when the parties proposed different constructions because the court could not identify a real dispute of a term's meaning). PSLC's argument is also undermined by its inconsistent application. PSLC points to where patentee supposedly defined fourteen different terms, *see* Dkt. 43 at 7, but it does not ask for construction of all these terms.

PSLC offers no other compelling reason for construction. It points to testimony from its expert that the patentee's definition of "small backup power systems" "capture[s] the specific applications described in the specification." Dkt. 43 at 6. Dr. Zane distinguished "'[l]arger' backup power systems and microgrids" from "smaller backup power systems." Dkt. 43-5 at ¶¶ 38–39. But even if this was the case, Plaintiff does not explain why construing the claim beyond its plain language is necessary to capture that distinction. *See, e.g.*, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2012 WL 2993856, at *6 (N.D. Cal. 2012) (refusing to construe a term because "there [wa]s no actual dispute between the parties regarding the scope of the claim term."). A lay jury could readily understand the plain meaning of "small backup power system" as not "large" without construction. Each component word—"small," "backup," and "power system"—relate to concepts that everyday people can understand. Additionally, the preamble to independent claim 17 already indicates that this "small backup power system" must be employed "[i]n a home or business."

D.   "terminal"

Similarly, PSLC provides no reason to construe "terminal." First, the Court is not beholden

8

to recognize every instance the patentee acted as lexicographer if there is no relevant dispute. Second, the prosecution history PSLC identified may shed light on the term "terminal," but an inventor cannot redefine a term outside the four corners of the original written description unless the statements meets the high standard of prosecution disclaimer, which PSLC has not shown. *Cf. Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003) (collecting cases); *see also Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003) ("[T]he applicants' statement [is not] a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term provided by the written description."). And like the previous term, a lay jury has sufficient context to understand the meaning of "terminal" already, as claim 17 specifies the relevant "contactor" has "**terminals for wiring** the contactor." '618 Pat. at Cl. 17.

E.  "via the connection or sensor coupled to the line connection"

After considering PSLC's brief, Generac withdraws its argument and agrees with PSLC that this term means "via the line connection or sensor coupled to the line connection."

F.  "the priority"

PSLC is incorrect that "the priority" "needs no antecedent basis." Dkt. 43 at 20. When antecedent basis cannot be inferred with reasonable certainty, it is necessary to meet the statutory requirement of "particularly pointing out and distinctly claiming the [invention's] subject matter." 35 U.S.C. § 112 ¶ 2. The challenged claims depend on claim 1, but that claim does not introduce what "the priority" is. As Dr. Leeb explained, there are many different parameters disclosed which can be labeled as a "priority." Ex. A at ¶¶ 78–84. But the claim or specification do not help a person of ordinary skill in the art know which one of those the inventor intended. *Id.*; *Dow Chemical Co. v. Nova Chemicals Corp.(Canada)*, 803 F. 3d 620, 635 (Fed. Cir. 2015) ("Neither the patent claims nor the specification here . . . provides any guidance as to which method should be used or even whether the possible universe of methods is limited to these four methods.").

9

PSLC's argument is founded on Dr. Zane's opinion that "priority is simply a parameter the installer assigns at the time of installation." Dkt. 43-5 at ¶ 78. But this does not address the issue—which parameter among those assigned at installation is "*the* priority"? Even if a "priority" is "simply a parameter that the installer assigns," as Dr. Zane advances, there are no boundaries for what *this* particular parameter is, such as its function or purpose. As PSLC acknowledges, "the use of 'priority' is replete in the specification," Dkt. 43 at 26, and takes on varied and contradictory definitions, Ex. A at ¶¶ 78–82. PSLC would like to point to any parameter an installer inputs as his subjective "importance" of the load and call it "*the* priority," but terms depending upon subjective opinion are insufficiently definite. Ex. A at ¶¶ 78, 82. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005). The specification provides lengthy dissertation, but verbosity is no substitute for distinctly claiming the invention. *Cf. Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms"). Because a "priority" is an arbitrary label, and can refer to any number of potential parameters, the patent fails to inform a person of ordinary skill in the art of the bounds of "*the* priority" with any reasonable certainty. Ex. A at ¶¶ 77, 84.

G.  **"unavoidable electronic circuit propagation delay time duration"**

As. Dr. Leeb explained, PSLC's response fails to resolve the ambiguity associated with this term. For example, which circuit experiences the "electronic circuit propagation delay," how is the "propagation delay" "known," or what "know[s]" it? Ex. A at ¶¶ 88–92. The ambiguity prevents a POSITA from understanding the scope of the claim with any reasonable certainty. *Id.*

The explanations from PSLC and its experts do not resolve this problem. They characterize "unavoidable electronic circuit propagation delay" as "the time delay that is necessarily present in the propagation delay present in all electric circuits." Dkt. 43 at 23. But this only confirms the term

10

lacks reasonable certainty because it describes a general concept—propagation delays inherent in electronics—and does not specifically claim *which* electronic circuit's propagation delay is the claim's subject. There are many different electronic circuits that may be at issue: processors, analog-to-digital converters, sensors, interface drivers, relays, communication buses, etc. *See* Ex. A at ¶¶ 89–90. PSLC and its expert provide no principled basis for a POSITA to know which electronic circuit must be measured to delineate the scope of the claim.

The patentee was focused on avoiding the rejection rather than distinctly pointing out what he claims as his invention with reasonable certainty. The term is indefinite.

### H. "the drop in frequency representing a known amount of power being supplied by the second power source"

PSLC argues the "magnitude" versus "occurrence" choice "does not exist," Dkt. 43 at 26, and the term only means an "occurrence" of a drop, *id.* ("[T]here is a drop or decrease from a first frequency to a second frequency and because it is a drop, the second frequency is lower."); Ex. A at ¶¶ 98–99. Yet, even though he proclaims otherwise, Dr. Zane appears to have acknowledged in his testimony that a "drop" can refer to a magnitude not just an occurrence. He opined that the claim "only makes sense if the drop in frequency *refers to an amount* of the decrease in frequency," Dkt. 43-5 at ¶ 107. "[A]n amount" is a magnitude of a drop. Ex. A at ¶¶ 101.

The patent describes several embodiments where the drop's magnitude reflects the amount of power, and not just an occurrence. *See, e.g.*, *id.* at ¶¶ 100–101. These embodiments—where the load coupler's response is based upon the magnitude of the drop rather than its occurrence—is even the focus of an asserted claim. '618 Pat., cl. 11 ("for lower than normal frequencies, a lower frequency will cause a load shed faster than a relatively higher frequency"). Neither PSLC nor its expert provides a principled basis for ignoring one of the two described meanings for "drop." They attempt instead to read out disclosed embodiments that rely on a "drop" as a magnitude to avoid

11

this ambiguity. But reading out preferred embodiments is improper. "Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F. 3d 1576, 1583–84 (Fed. Cir. 1996); *see also Epos Techs. Ltd. v. Pegasus Techs.*, 766 F. 3d 1338, 1346–48 (Fed. Cir. 2022) ("The district court's construction is incorrect because it reads out preferred embodiments.")

A POSITA would not be able to determine with any reasonable certainty whether "drop" here refers to embodiments that respond to the magnitude of the drop, or just the occurrence.

I. **"[T]he processor circuit causes a load shed in response to the amount of total load on the power source, the amount of total load being determined by an electronic circuit which is part of a control system of the power source"**

PSLC asks the Court to rewrite claim 12 to render it definite. PSLC alleges "[t]he claim, as written, is directed towards . . . a load coupler device ***configured to*** receive inputs and capable of acting on those inputs." Dkt. 43 at 23; *see also* Dkt. 43-5 at ¶ 88–89. While that might be a "straightforward and common way of claiming an apparatus," it is not how claim 12 is written. The claim requires more than an input: the input must be "determined" by a specific thing that is not part of the claimed apparatus. Reciting a specific external device, without tying its presence to a structural limitation in the claimed apparatus, renders the claim indefinite. *See Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011). PSLC did not distinguish *Rembrandt*.

PSLC asks this court to save its claim by reading in "configured to," as the claims in *RightQuestion* were written. *RightQuestion, LLC v. Samsung Elecs. Co*. *See* 2022 WL 1154611, at *9–*10 (E.D. Tex. Apr. 18, 2022). But courts cannot rewrite unambiguous claims to save them from indefiniteness. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014); *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). PSLC also cannot rewrite the claim such that the "control system [of the power source] could be within or outside the claimed load coupler device" as Dr. Zane suggests. Dkt. 43-5 at ¶ 89. His conclusion is contrary

12

to the express claim language. Claim 12 is a dependent of claim 1, which describes "a load coupler device" and "a power source" as distinct elements with a connection between the two—"a line connection for receiving A.C. electric power from [the] power source." The claims do not permit PSLC to blur the lines between two distinct elements. *See, e.g.*, *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("[W]e must give each claim term the respect that it is due"). Claim 12 unambiguously refers to an embodiment where the external control system of the power source determines total load. '618 Pat., 23:13–44 ("[m]any prior art generator systems incorporate digital engine and alternator control systems which incorporate monitoring [including] . . . power output . . . and percent of true total available power being supplied to the load" and "information about the operation of the generator . . . **directly from the engine and alternator control systems . . . via a communications link**").

PSLC's case law is unpersuasive. This limitation is not like the one construed in *HTC*. Dkt. 43 at 24. The independent claims at issue there merely involved an extended preamble describing the environment where a claimed device is naturally used. *See HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1274–75, 1277–78 (Fed. Cir. 2012). Here, the offending limitation is an express limitation and not in a preamble. It leaves an accused infringer unable to determine whether the claimed device infringes when sold, because a user may later configure it with some other external device that determines total load, which would fall outside the bounds of the claim. This ambiguity about claim scope is why courts find that combinations of apparatus and method steps are indefinite. *See, e.g.*, *M.E.C. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008).

**J.** **"The load coupler device of claim 1 wherein before the processor circuit would otherwise close the contactor to resupply power to the first load when the known time period elapses, in response to . . . via a current transformer, the total current being supplied by the power source, the processor first determines at least one of whether the power source is already overloaded or if connecting the first load will**

13

**cause the power source to become overloaded, and if one of these conditions exists, the processor does not close the contactor . . ."**

PSLC's arguments are unavailing. PSLC relies on Dr. Zane's opinion that "the claim as written" "cover[s] a situation where information is received from a current transformer." Dkt. 43-5 at ¶ 101. But this is precisely Generac's argument—the claim requires the input to the claimed device comes from a current transformer, but neither claim 1 nor dependent claim 16 claims a "load coupler device" comprising a current transformer. The specification shows current transformers were external structures installed alongside the claimed load coupler device, not part of it. *See, e.g.*, '618 Pat. at Figs. 4, 8, 15–16. It does not matter that a current transformer is a "common circuit option[] for the current sensor" or "the processor circuit has the capability to receive input . . . [that] can come from a current transformer." Dkt. 43-5 at ¶ 101, *see also* Dkt. 43 at 27. The claimed device does not comprise a current transformer, and so it is ambiguous whether infringement occurs by making or selling the claimed device. This makes the claim indefinite. *See, e.g.*, *Rembrandt*, 641 F.3d at 1330–40. PSLC asks the Court to rewrite its claim to preserve its validity, such as by interpreting the load coupler device to comprise a current transformer configured to determine total current, but this is not permitted. *See Hill-Rom*, 755 F.3d at 1374; *Chef Am.*, 358 F.3d at 1374.

K.  **"responsive to the amount of total load on the power source and one or more of voltage, current or frequency of the electric power supplied at the contactor line connection"**

As it has done elsewhere, PSLC selects one disclosed embodiment as to what the claim should cover and ignores the other, when the claim ambiguously could refer to either one. The '618 Patent discloses an embodiment where a load shed can be made based on *either* total load *or* a characteristic of the line connection, so long as it is capable of handling both conditions. *See, e.g.*, '618 Pat. at 27:15–28 (Load control 25a may "be caused to operate only when *one or more*

14

*parameter of the system* changes appreciably") (emphasis added); cl. 16 ("voltage . . . frequency . . . total load . . . *or* . . . total current). This term could alternatively mean, as PSLC argues, that a load shed occurs only when **both** total load **and** the line connection meets specific conditions. *See, e.g., id.* at 53:66–54:2 ("Load control 25c **may also sense** the voltage, distortion or other parameter of the power via 87 **and incorporate those measurements into the control**.") (emphasis added).

PSLC's expert provides no basis to choose the latter embodiment and disregard the former, when the former is expressly described in the specification. *See Vitronics*, 90 F. 3d at 1583–84 (reading out an embodiment is "rarely, if ever, correct."). The Court can disregard his testimony on this point. *Cf. Mirror Worlds Techs, LLC v. Meta Platforms*, 122 F. 4th 860, 875 (Fed. Cir. 2024) ("It is well-established that unsupported expert opinions do not create a genuine issue of material fact.") (quoting *Minkin v. Gibbons, P.C.*, 680 F.3d 1341, 1352 n.5 (Fed. Cir. 2012)).

L. **"sine wave distortion" / "sine distortion"**

PSLC proposes an alternative construction of "the amount of deviation from an ideal sine wave" for these terms. So, the dispute reduces to whether the ordinary meaning includes the phrase "the amount of …" as in PSLC's proposal. PSLC's stated rationale is that Defendants' proposed construction would exclude scenarios where the distortion is zero. Dkt. No. 43 at __. This concern is misplaced. Limitation (a) of Claim 66 of the '857 patent (from which Claim 77 also depends) already recites that "sine wave distortion … may range **from zero** to a maximum amount." Thus, PSLC's additional language is either superfluous or will only add confusion to the analysis.

M. **"power grid"**

The inventor has not redefined the term as PSLC argues. The specification expressly says that this term "is used herein in its common and ordinary meaning." '727 Pat., 15:21-24. It is also readily understandable by a lay jury. "[C]ourts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd.*, 521 F.3d at 1362.

15

Dated: February 27, 2026                    FISH & RICHARDSON P.C.

By: */s/ David B. Conrad*
Neil J. McNabnay
njm@fr.com
David B. Conrad
conrad@fr.com
Michael R. Ellis
ellis@fr.com
Brandon S. Avers
avers@fr.com

FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile)

***Attorneys for Defendant***
***Generac Power Systems, Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served via electronic mail on February 27, 2026, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ David B. Conrad*
David B. Conrad